UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| John J. Weber,<br>    *Plaintiff*,<br><br>    v.<br><br>FUJIFILM Medical Systems U.S.A., Inc., Hiroaki Tada, FUJIFILM Holdings America Corporation, FUJIFILM Holdings Corporation, and FUJIFILM Corporation,<br>    *Defendants*. | Civil No. 3:10cv401 (JBA)<br><br><br><br>February 4, 2011 |

RULING ON FUJIFILM HOLDINGS CORPORATION'S MOTION TO DISMISS
FOR LACK OF PERSONAL JURISDICTION

Plaintiff John J. Weber filed a Third Amended Complaint against FujiFilm Medical Systems U.S.A., Inc. ("FMSU"), Hiroaki Tada, FujiFilm Holdings American Corporation ("HLUS"), FujiFilm Holdings Corporation ("FH"), and FujiFilm Corporation on July 21, 2010, claiming a variety of causes of action as the result of his termination from FMSU. Defendant FH now moves to dismiss [Doc. # 129] Weber's Third Amended Complaint for lack of personal jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(2). For the reasons stated below, FH's Motion to Dismiss will be granted.

I. Relevant Factual Background

    A. Weber's Claims

Pyne Corporation hired Weber as its Vice–President and Chief Financial Officer "[i]n or about August 1986." (Third Am. Compl. [Doc. # 101] ¶ 5.) Weber claims that Charles Leslie, then President of Pyne, negotiated an employment agreement with Weber intended "to protect Weber in the event of a takeover and required that, unless terminated for cause, defined as willful malfeasance, such termination would be deemed a termination

without cause for which he would be entitled to receive one year of his full base salary and any and all benefits and entitlements then in place following such termination." (*Id.*) FujiFilm Global acquired Pyne Corporation in or about 1986, and Pyne became FujiFilm Medical Systems USA, Inc. ("FMSU"), a subsidiary of FujiFilm Global. (*Id.* ¶ 6.) Weber claims that his employment agreement bound FMSU, for whom he continued to work and where he held "high level corporate positions . . . such as Vice–President and Chief Financial Officer, as well as Senior Vice–President Operations, and ultimately Executive Vice–President." (*Id.* ¶ 7.) Weber also alleges that "[d]espite recommendations throughout his career with FMSU that Weber be named as President of FMSU, only individuals of Japanese ancestry were placed in that position after Mr. Leslie's tenure with the Company ended." (*Id.*)

In 1994, the FMSU Board approved a Benefit Restoration Plan referred to as "SERP" to allow "several more highly paid executives, including Weber and Charles Leslie" to accrue retirement benefits without disqualifying FMSU's employee retirement profit sharing plan under IRS rules and to "ensure that executives who were subject to IRS limitations on retirement profit sharing contributions received the amount of benefits to which they were otherwise entitled" by paying out benefits when a qualified employee retired from FMSU. (*Id.* ¶ 9.) Weber claims that he was entitled to receive this benefit payout "upon his separation from employment" with FMSU and that he refrained from "pursuing or accepting" other employment opportunities during his time at FMSU "due in part to the promise of benefit equalization provided by the second component of SERP." (*Id.* ¶¶ 10–11.)

"In or about 1996" FujiFilm Global approved FMSU to enter the picture archiving and communications systems ("PACS") market; "Weber was responsible for the preparation and presentation of all investment analyses." (*Id.* ¶¶ 12–13.) FMSU ultimately decided to "build its own PACS," and Weber was charged with bringing key software engineers to FMSU. (*Id.* ¶¶ 14–15.) In 2000, after completing PACS software development, "FMSU had one of the most advanced medical imaging network software on the market and began to compete successfully against G.E., Siemens and other medical imaging companies." (*Id.* ¶ 16.) FMSU then began "sales, maintenance and service of its internally developed PACS product, called Synapse." (*Id.* ¶ 19.) FMSU promoted Weber to Senior Vice President in January 1998, and Weber became responsible "for assisting the President with overall management, while overseeing all administrative areas, including finance, I.T., H.R. and legal," and also "for building a National Service and Technical Support Group" and "a Quality Assurance and Regulatory Assurance Department to ensure FDA compliance." (*Id.* ¶¶ 17–18.) In March 2006, FMSU appointed Makota Kawaguchi as President and CEO and promoted Weber to Executive Vice President, a role in which he "was responsible for the medical operations of the company and to direct, administer, and coordinate the activities of the organization, including sales, marketing, accounting, finances, and human resources." (*Id.* ¶ 19.) Weber alleges that "[t]he expressed purpose of this change was to make it appear that FMSU was an independent entity in the United States with leadership in the United States 'while maintaining our current reporting relationship to the Fuji Tokyo Medical Systems Business Division.'" (*Id.*) According to Weber, during his tenure at FMSU, he personally received many pay increases and performance–based bonuses, while FMSU experienced "significant success, growth, and profitability" and was "one of the most

3

respected providers of digital medical imaging systems" and "one of the few and most profitable United States subsidiaries." (*Id.* ¶¶ 21–24.) Weber also claims that at the time of his termination, he "was the highest ranking American born executive and corporate officer at FMSU." (*Id.* 25.)

In 2007, FujiFilm Global moved FMSU "under the legal umbrella" of FujiFilm Holdings America Corporation ("HLUS"), and in 2008 FMSU brought in Hiroaki Tada as its new President and CEO. (*Id.* ¶ 26.) Weber alleges that FujiFilm Global made these changes as part of a "strategy as to non–Japanese involvement in the management of the Company" and brought in Tada, the fifth FMSU President (all of whom were Japanese) in twelve years, "to eliminate executives such as Mr. Weber who were not Japanese born and/or of Japanese ancestry and who were advancing in age." (*Id.*) Weber maintains that prior to starting with FMSU, Tada headed up another HLUS subsidiary and had terminated the highest ranking American executive in that subsidiary, who was over fifty. (*Id.*) Of the approximately thirteen United States–operating subsidiaries under the HLUS umbrella in 2008, Weber claims that only five were led by non–Japanese executives. (*Id.* ¶ 27.) Tada informed Weber during a December 14, 2009 meeting that Weber "was being fired for cause effective December 31, 2009" due to a "negative and accusatory" audit report of FMSU's internal controls conducted by KPMG that was "purportedly" conducted to "help FMSU to comply with the Japanese Financial Instruments and Exchange Law" but according to Weber was "riddled with misstatements and inaccuracies." (*Id.* ¶¶ 40–43.) "Weber prepared a response to the report which documented the misstatements and inaccuracies but no reply was ever received." (*Id.* ¶ 42.) Tada also informed Weber that he was being fired because of errors in a merger filing in North Carolina where, despite Weber's belief that a merger

4

with North Carolina company Empiric LLC had been completed, "no legal merger of the companies had been finalized." (*Id.* ¶¶ 43, 46–48.) Weber alleges that during his tenure at FMSU, "no employee was ever fired for cause which, in the Company's practice and pursuant to Weber's employment agreement, is reserved for situations involving very serious malfeasance." (*Id.* ¶ 44.)

Weber alleges a pattern of activity leading up to his termination that suggested FMSU's intention to terminate him: (1) "Mr. Tada was overhead saying that Weber had to go"; (2) "[o]ther employees of FMSU were talking about the fact that Weber was to be terminated for months before his termination"; (3) Tada emailed Weber in March 2009 that Tada would be taking over Weber's sales responsibilities "despite [Weber's] proved record of success growing the business"; (4) FMSU hired Yujiro Nagawasa (Japanese–born or of Japanese ancestry and under forty years old) as Treasurer in July 2009 and then gave him "many of Weber's previous responsibilities" after Weber's termination; (5) Tada ordered Weber in October 2009 to terminate the Managing Director of Human Resources (age fifty–six); and (6) FMSU hired Naohiro Fujitani in "late 2009" as Executive Vice–President "with the apparent intent that he would take over as president and CEO." (*Id.* ¶¶ 28–34.)

According to Weber, "days" after his termination Tada also left FMSU, and Fujitani took over as the new President and CEO, effective April 1, 2010. Further, at least two other non–Japanese executives of other HLUS subsidiaries, all older than forty, "have been terminated or reached agreement to resign in exchange for severance benefits and/or consulting arrangements and agreements not to sue." (*Id.* ¶ 35.) Jonathan File, Group Vice President, General Counsel and Secretary of HLUS, who is not of Japanese descent and is

over forty, was also replaced by a younger Japanese counterpart because, according to Tada, File "was too old." (*Id.*)

Weber alleges that the reasons for his termination "are pretextual and were fabricated by Mr. Tada and FMSU, HLUS and FujiFilm Global in order to discharge him due to his age, national origin, ancestry and in retaliation for him complaining about same as well as to avoid having to provide Weber with one year salary and benefits upon termination without cause as required by his employment agreement." (*Id.* ¶ 51.) FMSU refused to pay Weber the "the amounts due him under the excess benefits SERP," and claimed that the benefit never existed. (*Id.* ¶ 55.) Although Weber's employment agreement entitled him to payment of "all compensation, benefits and entitlements at the rate in effect when he was terminated for one year," FMSU has made no such payment. (*Id.* ¶ 56.) Weber also claims that he was entitled to his annual bonus for 2009 pursuant to FMSU policy, but received no bonus. (*Id.* ¶ 57.)

B. FujiFilm Holdings Corporation

FH is "a corporation formed and maintained under the laws of Japan, with its headquarters and principal place of business [in] . . . Tokyo . . . , Japan." (Mishima Certification in Supp. of FH Mot. to Dismiss ¶ 2.) FH has no facilities in Connecticut, is not a resident of Connecticut, and does not own real property, have any employees, maintain an office, have a registered agent, solicit business, manufacture or sell products, conduct financial transactions, maintain bank accounts, or distribute products in Connecticut or elsewhere in the United States. (*Id.* ¶¶ 3–12.) FH also asserts that it "has never entered into any contract or agreement with John Weber in . . . Connecticut" and that there "are no direct wholly–owned subsidiaries of FH that conduct business in . . . Connecticut." (*Id.* ¶¶ 13–14.)

FH is the parent corporation of FujiFilm Corporation, which is, in turn, the parent corporation of HLUS, which is, in turn, the parent corporation of FMSU as well as ten other United States subsidiaries. (*Id.* ¶ 15.) FMSU is a wholly–owned subsidiary of HLUS, however, according to Kazuya Mishima, General Manager of the Legal Group of Corporate Planning Office for FH, FMSU is an independent entity "whose day to day operations are not fully controlled by FH." (*Id.* ¶ 16.) Mishima attests that FH and FMSU "are not controlled as a single, unified enterprise," and that FH observes "all corporate formalities" and "does not exercise day to day operational control over the finances, policy and business practices" of FMSU, maintains a separate bank account and operating budget and has separate management from FMSU. (*Id.* ¶¶ 17–21.)

Weber argues that top management at FH and FujiFilm Corporation "is the same" in reliance on FH's responses to Weber's request for admissions, yet FH denied the requests for admission with respect to the majority of these positions. (*Compare* Mem. Opp'n at 5–6, *with* FH Resp. to Req. for Admis., Ex. 6 to Mem. Opp'n at ¶¶ 1–2, 25–26, 27–28, 31–32.)[1]

---

[1] Weber cites FH's responses to request for admissions in support of his position that management at FH is the same as at FujiFilm Corporation, however FH denies all but three of the requests for admission relied on by Weber. Weber claims that Shigetaka Komori is the President and CEO of FH and FujiFilm Corporation (Mem. Opp'n at 5), however FH denies that Komori is the President and CEO of either FH or FujiFilm Corporation (FH Resp. to Req. for Admis. ¶¶ 25–26). Weber claims that Toshiro Takahashi is the CFO and Executive Vice–President for FH and FujiFilm Corporation (Mem. Opp'n at 6), however FH denies that Takahashi is the CFO and Executive Vice–President at either company (FH Resp. to Req. for Admis. ¶¶ 27–28). Weber claims that Toshiaki Suzuki is an Executive Officer of FH and a Corporate Vice–President of FujiFilm Corporation (Mem. Opp'n at 6), however, although FH admits that Suzuki is an Executive Officer of FH, it denies that he is the Corporate Vice–President of FujiFilm Corporation (FH Resp. to Req. for Admis. ¶¶ 1–2). FH, in its response to interrogatories, states that the denials with respect to Komori and Takahashi are because their names are misspelled and the denial with respect to Suzuki is because FujiFilm was misspelled. (FH Resp. to Interrog., Ex. 6 to Mem. Opp'n ¶¶ 3(a),

However, Ryutara Hosoda, in his August 31, 2010 deposition, testified that there are "overlaps" between FH and FujiFilm Corporation in Japan and that FujiFilm Corporation and FH share an e-mail system such that personnel for both companies share the same e-mail suffix/directory (i.e. the e-mail address for a person at either company would end in @fujifilm.co.jp). (Hosoda Deposition, Ex. 1 to Mem. Opp'n at 55:14–56:15.)

According to corporate history web pages for FujiFilm Global and FH, which distinguish between FH and FujiFilm Corporation, the corporate headquarters of both FH and FujiFilm Corporation are located in the same building in Tokyo, and FH "controls FujiFilm Corporation." (*See* FujiFilm Global History, Ex. 8 to Mem. Opp'n at 2; FH History, Ex. 7 to Mem. Opp'n at 2.) In responding to Weber's interrogatories, FH represented that the Operations Manager of the Legal Division at FujiFilm Corporation and outside counsel for HLUS assisted FH in providing those responses. (FH Resp. to Interrog. ¶ 1.) FH reported $4,213,878,000 in revenue from "The Americas" in the fiscal year ending March 31, 2009 (Ex. 12 to Mem. Opp'n at 92), and acknowledged that "some" of its revenue is "attributable to the sale of equipment and/or services directly to consumers in Connecticut" and "to the operation of FMSU in Stamford, Connecticut" (FH Resp. to Interrog. ¶¶ 52, 57).

Several documents related to this litigation also use the corporate identity "FujiFilm Tokyo" or "FTYO," which Weber claims is actually another name for FH. (Mem. Opp'n at

---

(n)–(q).) Ryutara Hosoda in fact testified during his deposition in this matter that Takahashi is the FH CFO, but was not sure if he also had a position at FujiFilm Corporation. (Hosoda Dep. at 64:20–65:4.)

FH does admit, however, that Tadashi Sasaki and Nobuaki Inoue are both directors of FH and directors and senior vice-presidents of FujiFilm Corporation. (FH Resp. to Req. for Admis. ¶¶ 31, 32.)

10.) Weber accordingly attempts to attribute FTYO actions regarding legal advice and Weber's termination to FH. (*Id.* at 10–12.) However, FH, in its response to Weber's requests for admission and interrogatories, asserted that FTYO referred to FujiFilm Corporation rather than FH, (FH Resp. to Req. for Admis. ¶ 33; FH Resp. to Interog. ¶ 3(x)), and Weber does not provide any evidence that FH and FTYO are, in fact, the same entity.

   C.  FujiFilm Holdings Corporation's Involvement in Weber's Termination

   Masahiro Miki, former statutory auditor at FH (FH Resp. to Req. for Admis. ¶ 4, FH Resp. to Interrog. ¶ 3(c)), along with Yasuo Ichinose, General Manager of Internal Audit Division, prepared an FMSU 2007 Audit document, some of the information for which he obtained at the Stamford, Connecticut FMSU headquarters, which included the comment: "We believe that it is now time to reevaluate whether John Weber and his old team would be enough to handle the change in the profit structure." (Ex. 15 to Mem. Opp'n; FH Resp. to Req. for Admis. ¶¶ 6–7; FH Resp. to Interrog. ¶ 3(e).) Ryutari Hosoda testified during his August 31, 2010 deposition that this FMSU audit would have taken place "at FMSU." (Hosoda Dep. at 85:2–5.) Hiroaki Tada, during his April 20, 2010 deposition, testified that Miki instructed him, before Tada took over as the head of FMSU, that Tada was charged with "chang[ing] the management style of the company" in that Miki was concerned that previously "there was too much power given" to Weber because "most of the decision making was going through only one person." (Tada Dep., Ex. 9 to Mem. Opp'n at 43:4–45:18.) Tada also testified regarding a document that allegedly discusses plans to terminate Weber's employment[2] written by Tazuo Nakamura, former head of medical

---

[2] Weber attaches the original Japanese–language version of this document to his Memorandum in Opposition, but does not attach a certified translation of the document.

systems for FujiFilm Corporation (FH Resp. to Req. for Admis. ¶ 3; FH Resp. to Interrog. ¶ 3(b)), in response to questions asked by "the president of Fuji Japan."[3] One of Nakamura's answers reads, in part, that "John Weber has a lot of power" and "we are moving towards having [Weber] quit the company by the end of the fiscal year, which would be May 2010." (Tada Dep. at 194:12–196:13.) According to Tada, a handwritten note by "the president" next to that answer read: "Do it quicker, this has taken over a year already." (*Id.* at 199:18–22.) In response to this document, Tada "brought up the period [w]here I will have him quit." (*Id.* at 200:11–16.)

II.  Discussion

When a defendant moves to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction, the "plaintiff bears the burden of showing that the court has jurisdiction over the defendant." *In re Magnetic Audiotape Antitrust Lithog.*, 334 F.3d 204, 206 (2d Cir. 2003). The showing necessary to meet this burden depends on the stage at which the motion is brought and whether jurisdictional discovery has been conducted: prior to discovery, a plaintiff may defeat at 12(b)(2) motion by pleading in good faith "legally sufficient allegations of jurisdiction," however "[after discovery, the plaintiff's *prima facie* showing, necessary to defeat a jurisdiction testing motion, must include an averment of facts that, if credited by the trier, would suffice to establish jurisdiction over the defendant." *Ball v. Metallurgic Hoboken–Overeat S.A.*, 902

---

(*See* Ex. 16 to Mem. Opp'n.)

[3] Tada does not name "the president" and it is unclear which corporate identity "Fuji Japan" refers to.

F.2d 194, 197 (2d Cir. 1990); *see also Chloe v. Queen Bee of Beverly Hills, LLC*, 616 F.3d 158, 163 (2d Cir. 2010).

Here, because the parties have completed jurisdictional discovery, the higher burden applies. The Court will apply a familiar two-step analysis "[t]o determine personal jurisdiction over a non-domiciliary in a case involving a federal question": (1) "apply the forum state's long-arm statute," and (2) "[i]f the long-arm statute permits personal jurisdiction, . . . analyze whether personal jurisdiction comports with the Due Process Clause of the United States Constitution." *Chloe*, 616 F.3d at 163–64; *see also Metro. Life Ins. Co. v. Roberston-Ceco Corp.*, 84 F.3d 560, 566 (2d Cir. 1996). The due process analysis itself has two sub-components: the defendant must have sufficient "minimum contacts" with the forum state and the exercise of personal jurisdiction must "comport[]with 'traditional notions of fair play and substantial justice'—that is, whether it is reasonable to exercise personal jurisdiction under the circumstances of the particular case." *Chloe*, 616 F.3d at 164 (citing *Int'l Shoe v. Washington*, 326 U.S. 310, 316 (1945)).

A. The Connecticut Long-Arm Statute

The relevant Connecticut long-arm statute reads:

Every foreign corporation shall be subject to suit in this state, by a resident of this state or by a person having a usual place of business in this state, whether or not such foreign corporation is transacting or has transacted business in this state and whether or not it is engaged exclusively in interstate or foreign commerce, on any cause of action arising as follows: (1) Out of any contract made in this state or to be performed in this state; (2) out of any business solicited in this state by mail or otherwise if the corporation has repeatedly so solicited business, whether the orders or offers relating thereto were accepted within or without the state; (3) out of the production, manufacture or distribution of goods by such corporation with the reasonable expectation that such goods are to be used or consumed in this state and are so used or consumed, regardless of how or where the goods

> were produced, manufactured, marketed or sold or whether or not through the medium of independent contractors or dealers; or (4) out of tortious conduct in this state, whether arising out of repeated activity or single acts, and whether arising out of misfeasance or nonfeasance.

Conn. Gen. Stat. § 33-929(f). FH argues that it is not subject to jurisdiction under the long–arm statute because (1) it has not entered into any contract with Weber in Connecticut; (2) it has not solicited any business in Connecticut; (3) it does not manufacture or distribute any products in Connecticut; and (4) Weber has not alleged any tortious conduct by FH in Connecticut. (Mem. Supp. [Doc. # 129–1] at 5–8.) Weber does not claim that FH is subject to the second or third subsections of the Connecticut long–arm statute, but instead, pursuant to §§ 33-929(f)(1) and (4), that his claim arises out of a Connecticut contract and tortious conduct in Connecticut because "FH and its auditors in Connecticut directed and caused the termination of Plaintiff's employment contract which was being performed in Connecticut . . . [and] Plaintiff's causes of action against FH for tortuous [sic] interference with contract and business expectancies of Plaintiff are all part and parcel of that same conduct plus subsequent conduct via telephone calls, memos and e–mails sent to Mr. Tada." (Mem. Opp'n at 25.) Neither of these arguments, coupled with Weber's averment of facts, is sufficient to establish jurisdiction under Connecticut's long–arm statute.

First, with respect to Section 33-929(f)(1), Weber has failed to include any "averment of facts that, if credited by the trier, would suffice" to demonstrate that FH entered into a contract with Weber in Connecticut. *See Ball*, 902 F.2d at 197. In his Third Amended Complaint, Weber claims that he negotiated his employment agreement with Pyne Corporation and that the agreement bound FMSU following FMSU's acquisition of Pyne. (Third Am. Compl. ¶¶ 5–7.) Because Weber does not allege that he ever entered into any

12

contract with FH, either in Connecticut or to be performed in Connecticut, *see* Conn. Gen. Stat.§ 33929(f)(1), he has failed to make a *prima facie* showing of jurisdiction under § 33-929(f)(1) necessary to rebut FH's motion to dismiss.

Second, with respect to Section 33-929(f)(4), Weber incorrectly argues that the tortious conduct giving rise to personal jurisdiction need not take place in Connecticut. Weber bases his argument on the Second Circuit's analysis in *Chloe* of the New York long–arm statute providing jurisdiction over a party that "transacts any business within the state or contracts anywhere to supply goods or services in the state." *See Chloe*, 616 F.3d at 169.[4]  Thus, although the Second Circuit in *Chloe* held that business activity within the

---

[4] At oral argument, counsel for Weber argued that the Second Circuit's interpretation of the long–arm statute at issue in *Chloe* pertained to the analysis here because the Connecticut Supreme Court in *Zartolas v. Nisenfeld*, 184 Conn. 471, 474 (1981) and Judge Egington in *Mozes ex rel. Gen. Elec. Co. v. Welch*, 638 F. Supp. 215, 223 (D. Conn. 1986), held that because the Connecticut long–arm statute is based on the New York long–arm statute, it is prudent to look to cases interpreting the New York statute.  This argument fails to recognize, however, that both *Zartolas*, 184 Conn. at 474, and *Mozes*, 638 F. Supp. at 223, concerned different sections of the long–arm statute unrelated to tortious conduct, as well as the differences in the comparable statutory language addressed above.

Weber also filed a post–argument Sur–Reply [Doc. # 195] calling attention to *Adams v. Guthy Renker Corporation*, 106 F. Supp. 2d 400 (Conn. 2000) and arguing that it demonstrates that "telephone calls, memos and e–mails sent to Mr. Tada in Connecticut are sufficient to trigger application of the Connecticut long–arm statute. (Sur–Reply at 2–3.) The court in *Adams* ruled that "[f]alse representations entering Connecticut" via either wire, mail, telephone, or in person constituted tortious conduct in Connecticut under the long–arm statute.  106 F. Supp. 2d at 404.  *Adams*, and the cases upon which it relied, concerned false representations only, and do not stand for a broader proposition that any statement entering Connecticut could qualify as "tortious conduct in this state." Weber does not allege that the statements made by Miki, the only FH employee to whom Weber's factual averment attributes any statements, were false, only that these statements "directed and caused the termination of Plaintiff's employment contract." (Mem. Opp'n at 25.) In the case of a false representation, "[w]here a defendant knowingly sends into a state a false statement, intending that it should there be relied upon to the injury of a resident of that state, he has,

13

meaning of the New York long–arm statute did not require physical presence, 616 F.3d at 169–70, Section 33-929(f)(4) does require "that the alleged tortious act must have actually occurred in Connecticut." *Amerbelle Corp. v. Hommel*, 272 F. Supp. 2d 189, 194–95 (D. Conn. 2003) (citing *Bross Utils. Serv. Corp. v. Aboudshait*, 489 F. Supp. 1366, 1372–73 (D. Conn. 1980); *Chaiken v. VV Publ.*, 119 F.3d 1018, 1026 (2d Cir. 1997)). Weber's only allegation of FH conduct in Connecticut concerns the audit performed by Masahiro Miki and Yasuo Ichinose at FMSU in Stamford in 2007. (*See* FH Resp. to Req. for Admis.¶¶ 6–7; FH Resp. to Interrog. ¶ 3(e); Hosoda Dep. at 85:2–5.) Other than this audit, Weber does not claim that any FH involvement in the termination decision actually took place in Connecticut.

Weber's averment of facts does not clarify what role FH played in this termination decision beyond the 2007 audit, which Weber does not claim was, in itself, tortious. According to Weber's Third Amended Complaint and his averment of facts presented in opposition to FH's Motion to Dismiss, Hiroaki Tada, employed by FMSU, informed Weber of the termination. (Third Am. Compl. ¶¶ 40–43.) Tada testified during his deposition that Miki instructed him to "change the management style of the company" and was concerned that "there was too much power given" to Weber (Tada Dep. at 43:4–45:18), but did not claim that Miki, or anyone else employed by FH, instructed him to fire Weber. In the untranslated document discussed by Tada at his deposition, Tada testified

---

for jurisdictional purposes, acted within that state." *McFaddin v. Nat'l Exec. Search, Inc.*, 354 F. Supp. 1166, 1171 (D. Conn. 1973) (quoting *Murphy v. Erwin–Wasey, Inc.*, 460 F.2d 661, 664 (1st Cir. 1973)). No similar principle transforms a statement conveying an allegedly tortious decision made elsewhere and sent into the state into tortious action within that state. Weber's reliance on *Adams* is accordingly misplaced.

that Tazuo Nakamura, employed by FujiFilm Corporation, and "the president of Fuji Japan" discussed terminating Weber (*id.* at 194:12–196:13), however Weber presents no facts that attribute this document to FH. Because Weber is unable to tie any of the termination actions to FH, none of these facts suffice to demonstrate that FH engaged in any tortious conduct in Connecticut relating to Weber's discharge, and Weber cannot make the requisite *prima facie* showing of jurisdiction under § 33-929(f)(4) to overcome FH's motion to dismiss. *See Ball*, 902 F.2d at 197.

      B.      Piercing the Corporate Veil

Weber argues that even in the absence of personal jurisdiction over FH, the Court should, pursuant to Connecticut law, pierce the corporate veil and attribute to FH the conduct of its subsidiaries because FH and FujiFilm Corporation "continue to operate as a single identity for most substantial purposes and [are] still viewed by many, including their shared counsel and affiliated corporate entities, depending on the issue involved, as interchangeable . . . FH is thus not entitled to assert a claimed separate corporate identity to avoid the Court's jurisdiction over it or its liability to Plaintiff." (Mem. Opp'n at 23.)

At oral argument, Weber's counsel suggested that a "less onerous" standard applied to veil–piercing for jurisdictional rather than liability purposes, that does not rely on the law of corporate veil–piercing of the place of incorporation, but instead asks only "whether the corporation is a real or shell entity." *Marine Midland Bank, N.A. v. Miller*, 664 F.2d 899, 903–04 (2d Cir. 1981). This lower standard effectively disregards the remaining elements of veil–piercing beyond the threshold question of whether a corporation exists without any independent will or identity of its own, in effect rendering it a mere "shell." *Id.* However, because Weber has failed to demonstrate that FujiFilm Corporation is fully controlled by,

15

has no independence from, and is a "shell" of FH, the Court need not inquire further into which veil–piercing standard applies to this jurisdictional question; Weber cannot succeed under any of the standards he advances.

Whether the Court adopts the jurisdictional "shell" standard, the Connecticut instrumentality or identity standard, or the Japanese standard as explained by Defendants,[5] Weber must, at a minimum, be able to demonstrate that FH, during the relevant time period, fully controlled FujiFilm Corporation such that FujiFilm Corporation was not an independent entity. *See Davenport v. Quinn*, 53 Conn. App. 282, 300–01 (1999) (under the Connecticut instrumentality test for veil–piercing, a plaintiff must first show "[c]ontrol, not mere majority or complete stock control, but complete domination, not only of finances, but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own"; under the identity test a plaintiff must first show "that there was such a unity of interest and ownership that the independence of the corporations had in effect ceased or had never begun"); *Miller*, 664 F.2d at 904 ("In deciding the limited question of whether it had jurisdiction, the court should have looked only to the question whether Miller & Associates was a shell for Miller."); (Watanabe Cert., Ex. B to Mem. in Further Supp. ¶¶ 7–8 (the first inquiry in piercing the corporate veil under Japanese law is whether "one company fully controls another company or subsidiary")). Weber cannot meet this burden.

---

[5] FH argues that Japanese, rather than Connecticut, corporate law governs any potential veil–piercing and that under Japanese law "the undisputed evidence establishes that the 'corporate veil' between FH and FujiFilm Corporation cannot be pierced." (Mem. in Further Supp. at 3–8.)

Despite Weber's assertion that FH and FujiFilm Corporation "operate as a single entity for most substantial purposes" (Mem. Opp'n at 23), FH denied in its responses to Weber's requests for admission that management at FH overlapped with that at FujiFilm Corporation (*see* FH Resp. to Req. for Admis. ¶¶ 1–2, 25–28, 31–32). Although FH admits that these denials stemmed from misspellings in the requests to admit (*see* FH Resp. to Interrog. ¶¶ 3(a), (n)–(q)), they are still denials, leaving Weber with no factual support for his position regarding the singular operation of both corporations. Ryutara Hosada testified that there are "overlaps" in management between the two corporations and that the two share an e-mail system (Hosoda Dep. at 55:14–56:15), and according to corporate history web pages, the two corporations' headquarters are housed in the same building in Tokyo (Exs. 7–8 to Mem. Opp'n). These unspecified overlaps in management and a shared facility and e-mail system do not demonstrate complete domination or control, or the existence of FH as a mere shell for FujiFilm Corporation. *See Davenport*, 53 Conn. App. at 300–01; *Miller*, 664 F.2d at 904. Similarly, the generalized statement on FH's and FujiFilm Corporation's corporate history web pages that FH "controls Fujifilm corporation," provides no specifics as to FH's control over FujiFilm corporation such that Weber can show that any control by FH left FujiFilm Corporation without an existence or will of its own. *See Davenport*, 53 Conn. App. at 300.

As Weber cannot satisfy his burden under any of the proposed veil-piercing standards, the Court will not pierce the corporate veil with respect to FH and FujiFilm Corporation so as to exercise personal jurisdiction over FH.

C.  Rule 4(k)(2)

Weber also argues that the Court should exercise personal jurisdiction over FH pursuant to Federal Rule of Civil Procedure 4(k)(2), which provides: "For a claim that arises under federal law, serving a summons or filing a waiver of service establishes personal jurisdiction over a defendant if: (A) the defendant is not subject to jurisdiction in any state's courts of general jurisdiction; and (B) exercising jurisdiction is consistent with the United States Constitution and laws." (Mem. Opp'n at 25–27.)  Rule 4(k)(2) confers jurisdiction over a defendant only if the exercise of that jurisdiction comports with the Due Process Clause of the Fifth Amendment. *Porina v. Marward Shipping Co.*, 521 F.3d 122, 127 (2d Cir. 2008) (citing *Dardana Ltd. v. Yuganskneftegaz*, 317 F.3d 202, 207 (2d Cir. 2003)).

Analysis of whether personal jurisdiction "comports with the Due Process Clause of the United States Constitution" requires two inquiries: the Court must determine whether a defendant has "minimum contacts" with the forum state and whether the exercise of jurisdiction over that defendant is "reasonable" such that it "comports with 'traditional notions of fair play and substantial justice'—that is, whether it is reasonable to exercise personal jurisdiction under the circumstances of the particular case." *Chloe*, 616 F.3d at 164 (citing *Int'l Shoe*, 326 U.S. at 316).  Minimum contacts can arise in two contexts: specific jurisdiction, where the forum "exercises personal jurisdiction over a defendant in a suit arising out of or related to the defendant's contacts with the forum"; and general jurisdiction, where the forum exercises jurisdiction "based on the defendant's general business contacts with the forum state . . . where the subject matter of the suit is unrelated to those contacts." *Chloe*, 616 F.3d at 164 (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414–15 & n. 8, 9 (1984)).  With specific jurisdiction, "minimum

contacts exist where the defendant purposefully availed itself of the privilege of doing business in the forum and could foresee being haled into court there." *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 127 (2d Cir. 2002) (internal quotations and citations omitted). With general jurisdiction, the defendant's contacts with the forum state must be "continuous and systematic." *Id.*

Weber's averment of facts shows neither that FH purposefully availed itself of the privileged of doing business in Connecticut, nor that FH had continuous and systematic contacts with Connecticut. As the Court will not pierce the corporate veil between FH and FujiFilm Corporation, the only actions by FH that arguably occurred in, or had an effect in Connecticut are Masahiro Miki's 2007 audit, based, at least in part, on information compiled in Stamford, Connecticut, and Miki's comment to Hiroaki Tada to "change the management style of the company." (Ex. 15 to Mem. Opp'n; FH Resp. to Req. for Admis. ¶¶ 6–7; FH Resp. to Interrog. ¶ 3(e); Tada Dep. at 3:4–45:18.) These two actions fall far short of the purposeful activities through which a party avails itself of the benefits of a forum state, but instead resemble the "'random, fortuitous, or attenuated contacts' . . . that the purposeful availment requirement is designed to eliminate as a basis for jurisdiction." *Bank Brussels*, 305 F.3d at 128–29 (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985)) (holding that "a law firm which seeks to be known in the New York legal market, makes efforts to promote and maintain a client base there, and profits substantially therefrom" had purposefully availed itself of the New York forum). Through Miki's audit of FMSU in Connecticut and subsequent comment to Tada regarding FMSU management and decision–making authority, FH has not engaged in the solicitous profit–seeking activity that constitutes "purposefully avail[ing] itself of the privilege of doing business" in Connecticut.

19

*See id.* Rather, the facts as presented by Weber show that FH simply reviewed the business activities of its thrice–removed subsidiary on an isolated occasion. This one–off review does not rise to the "continuous and systematic" necessary for the Court to exercise general jurisdiction under the Due Process clause. *Id.* at 127.

Weber has accordingly failed to demonstrate that FH has minimum contacts with Connecticut and the exercise of this Court's jurisdiction over FH pursuant would not comply with the Due Process Clause of the Fifth Amendment to the United States Constitution. Therefore, the Court will not exercise personal jurisdiction over FH pursuant to Federal Rule of Civil Procedure 4(k)(2).

III. Conclusion

For the reasons stated above, Defendant FH's Motion to Dismiss [Doc. # 129] Plaintiff's Third Amended Complaint is GRANTED.

IT IS SO ORDERED.

/s/
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 4th day of February, 2011.