UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| John J. Weber,<br>    *Plaintiff*,<br><br>v.<br><br>FUJIFILM Medical Systems U.S.A., Inc., Hiroaki Tada, FUJIFILM Holdings America Corporation, FUJIFILM Holdings Corporation, and FUJIFILM Corporation,<br>    *Defendants*. | Civil No. 3:10cv401 (JBA)<br><br><br><br>February 28, 2011 |

RULING ON PLAINTIFF'S MOTION TO DISMISS DEFENDANT FUJIFILM
MEDICAL SYSTEMS U.S.A., INC.'S COUNTERCLAIMS

Plaintiff John J. Weber filed a Third Amended Complaint against FujiFilm Medical Systems U.S.A., Inc. ("FMSU"), Hiroaki Tada, FujiFilm Holdings American Corporation ("HLUS"), FujiFilm Holdings Corporation ("FH"), and FujiFilm Corporation on July 21, 2010, claiming, as the result of his termination from FMSU, breach of employment contract, breach of the implied covenant of good faith and fair dealing, tortious interference with contractual relations, tortious interference with business expectancy, civil conspiracy, defamation per se, breach of excess benefit SERP, breach of the implied covenant of good faith and fair dealing, misrepresentation, promissory estoppel, violation of Connecticut Payment of Wages Law, violation of ERISA, violation of Title VII of the Civil Rights Act of 1964, violation of CFEPA, violation of the Age Discrimination in Employment Act, and violation of 42 U.S.C. § 1981. On July 23, 2010, FMSU filed an Answer to Weber's Third Amended Complaint and asserted twelve counterclaims against Weber, including fraud, breach of fiduciary duty, conversion, statutory theft, aiding and abetting fraud, civil conspiracy to commit fraud, civil conspiracy to commit statutory theft, civil conspiracy to

tortiously convert FMSU's property, fraudulent concealment, intentional misrepresentation, constructive fraud, and health insurance fraud.  Weber now moves to dismiss [Doc. # 119] FMSU's counterclaims pursuant to Federal Rules of Civil Procedure 12(b)(1) and (6), and 9(b).  For the reasons stated below, Weber's motion will be granted.

I.    Relevant Factual Background

    A.    Weber's Claims

For a discussion of the relevant background to Weber's claims against Defendants, see the Court's February 4, 2011 Ruling on FujiFilm Holdings Corporation's Motion to Dismiss [Doc. # 220].

    B.    FMSU's Counterclaims

In its counterclaims, FMSU alleges that Weber over a twelve–year period beginning in 1997, Weber improperly and unlawfully directed the payment of approximately $309,212.34 in salary and "thousands of dollars in health benefits" to former FMSU employee Louise Collins, and used his position as "an executive responsible for Human Resources, Finance, and Legal functions" at FMSU to make these payments and conceal them from FMSU leadership.  (Counterclaims [Doc. # 102] at ¶ 23.)  According to FMSU, on September 11, 1986 Weber hired Collins, who had worked with Weber for eight years at Cadbury Schweppes Limited, as his administrative assistant and/or assistant office manager at Pyne Corporation.  (*Id.* ¶ 4.)  Collins continued in this position after FMSU acquired Pyne.  (*Id.*)  In 1995, Collins "sustained a non–work related injury" that forced her to eventually leave her employment with FMSU on January 17, 1997.  (*Id.* ¶ 5.)  She collected short–term disability benefits between January 17, 1997 and April 1997.  (*Id.*)

FMSU claims that Weber hired an outside lawyer at FMSU's expense to represent Collins in connection with her application for long–term disability benefits, knowing that "FMSU's policies did not permit him to do so and absent approval from any person having such authority." (*Id.* ¶ 6.) After FMSU's long–term disability carrier denied Collins' claim for long–term benefits on or about September 15, 1997, the lawyers hired by Weber at FMSU's expense administratively appealed the denial. (*Id.* ¶ 8–9.) FMSU's carrier upheld the denial in May 1998. (*Id.* ¶ 9.) Weber concealed from the then–FMSU President and Board of Directors that he had retained counsel to represent Collins and that FMSU paid her legal expenses. (*Id.* ¶ 10.)

FMSU further alleges that beginning in April 1997, after Collins' short–term benefits expired, Weber directed FMSU's Payroll and Benefits Manager Pam Doyle to continue Ms. Collins' full salary and health benefits even though Weber knew that Collins was not authorized to receive these payments, FMSU's policies prohibited these payments, and he had no authority or permission to make these payments. (*Id.* ¶ 11.) According to FMSU, Doyle made the payments "in reliance upon Weber's knowing false statements that such payments were proper and as a result of Ms. Doyle's understanding that an employee who refused to carry out Mr. Weber's instructions could be termed insubordinate and face workplace discipline up to and including discharge." (*Id.*) FMSU also alleges that Weber falsified company documents to portray Ms. Collins as continuing her FMSU employment to conceal the improper payments from "other responsible FMSU executives, responsible personnel and auditors." (*Id.*)

According to FMSU, Weber acted without the approval of FMSU's President or Board of Directors and ignored the concerns of various subordinate employees who

attempted to stop the payments. (*Id.* ¶¶ 12–13.) He dissuaded Human Resources Manager Rita Coan from reporting these payments by telling her that they were severance owed to Ms. Collins. (*Id.* ¶ 14.) After Coan had Doyle prepare a letter to Collins in April 2000 regarding COBRA benefits, Weber instructed Coan "not to send it and to continue paying the health and medical benefits component of the Collins Payments." (*Id.* ¶ 15.) In September 2003, Weber had Doyle send a letter to Collins' landlord "falsely verifying that she was then earning an approximately $42,000.00 annual 'salary' with FMSU." (*Id.* ¶ 16.)

FMSU claims that "[i]n March 2004, the then Human Resources Manager, Larry Hart, directed Ms. Doyle to remove Ms. Collins from FMSU's payroll, but to continue the health benefits portion of the Collins Payments" at Weber's direction because Collins had become eligible for Social Security benefits. (*Id.* ¶¶ 18–19.) Weber "continued the benefits portion of the Collins Payments until October 2009," at which point Hart directed Doyle to remove Collins from FMSU's insurance plan. (*Id.* ¶ 20.)

FMSU alleges that it first learned of Weber's actions after he was fired in December 2009. (*Id.* ¶ 26.) FMSU also claims that Weber breached his fiduciary duty to FMSU by failing to disclose and concealing through intimidation the material facts regarding the payments and disbursements to Collins for her legal expenses. (*Id.* ¶¶ 27–30.)

In addition to its claims with respect to the Collins payments, FMSU alleges that just before his termination, Weber directed FMSU Financial Reporting Manager Brian Higgins to shred documents related to the SERP plan in order to mislead FMSU's President, Hiroaki Tada, about which SERP plan was the appropriate one. (*Id.* ¶ 32–33.) "Weber further directed Mr. Higgins to lie to Mr. Tada and state that the SERP plan, without the cap, was the appropriate SERP plan. Mr. Higgins refused to follow Weber's directives." (*Id.* ¶ 33.)

4

II. Legal Standard

"[A] claim is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) when the district court lacks the statutory or constitutional power to adjudicate it." *Morrison v. Nat'l Australia Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (quoting *Arar v. Ashcroft*, 532 F.3d 157, 168 (2d Cir. 2008)). "When considering a motion to dismiss pursuant to Rule 12(b)(1), the court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff." *Sweet v. Sheahan*, 235 F.3d 80, 83 (2d Cir. 2000). In response to a motion to dismiss pursuant to Rule 12(b)(1), "[a] plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000).

III. Discussion

    A. Subject Matter Jurisdiction

Weber argues that because the counterclaims do not arise from the same transaction or occurrence as the original Complaint, they are permissive rather than compulsory, and therefore require an independent basis for the exercise of federal jurisdiction, which Weber argues is lacking because Defendants bring the counterclaims against a non–diverse party under state law. (Mem. Supp. [Doc. # 119] at 11–14.) FMSU counters that the counterclaims are compulsory, having arisen out of "the termination of Weber's employment and the parties' performance under Weber's Employment Agreement," which form the basis of Weber's claims; and that even if the counterclaims are not compulsory, the Court should exercise supplemental jurisdiction. (Mem. Opp'n [Doc. # 127] at 3–8.)

A compulsory counterclaim is one "that—at the time of its service—the pleader has against an opposing party if the claim: (A) arises out of the transaction or occurrence that

is the subject matter of the opposing party's claim; and (B) does not require adding another party over whom the court cannot acquire jurisdiction." Fed. R. Civ. P. 13(a). A permissive counterclaim is any counterclaim that is not compulsory. Fed. R. Civ. P. 13(b). A district court "may not exercise its ancillary power of jurisdiction over [permissive counterclaims] unless there exists some independent jurisdictional base such as the existence of a federal question upon which federal jurisdiction may be founded." *Federman v. Empire Fire & Marine Ins. Co.*, 597 F.2d 798, 812 (2d Cir. 1979).

The Second Circuit takes a "broad view" of whether a counterclaim "arises out of the transaction or occurrence that is the subject matter of the opposing party's claim" and requires only a "'logical relationship' between the counterclaim and the main claim." *Jones v. Ford Motor Credit Co.*, 358 F.3d 205, 209 (2d Cir. 2004) (citing *United States v. Aquavella*, 615 F.2d 12, 22 (2d Cir. 1979)). "Although the 'logical relationship' test does not require 'an absolute identity of factual backgrounds,' . . . the 'essential facts of the claim [must be] so logically connected that the considerations of judicial economy and fairness dictate that all the issues be resolved in one lawsuit.'" *Id.* at 209–210 (quoting *Aquavella*, 615 F.2d at 22; *Critical–Vac Filtration Corp. v. Minuteman Int'l, Inc.*, 233 F.3d 697, 699 (2d Cir. 2000)) (no logical relationship between plaintiffs' Equal Credit Opportunity Act claim that Ford Credit imposed higher finance charges on their purchases than on similarly situated white customers and Ford Credit's debt collection counterclaims against individual plaintiffs where the only connection between the two was that they were both precipitated by a vehicle sale and purchase contract).

Here, the transaction or occurrence that forms the subject matter of Weber's claims is his termination from FMSU. On the other hand, FMSU's counterclaims concern Weber's

actions during his time at FMSU, none of which served as the basis for his discharge. The only common fact between the complaint and the counterclaims is that Weber worked at FMSU.

FMSU argues that where "a plaintiff–employee has raised discriminatory termination claims and the employer's counterclaims relate to the discovery of improper conduct that would have provided a basis for the termination, courts have found that the employer's counterclaims are compulsory." (Mem. Opp'n at 4–5.) There is no such *per se* logical relationship, however; a more nuanced fact–based consideration of the relationship between a discriminatory termination claim and a counterclaim alleging improper on–the–job conduct is instead required. In *Ginsburg v. Valhalla Anesthesia Assoc., P.C.*, Judge Baer concluded that the plaintiff anesthesiologist's claims for wrongful termination on the basis of her sex and pregnancy and the defendant's first counterclaim—seeking the cost of benefits paid to the plaintiff while on maternity leave that was "predicated on the assumption that plaintiff was not fired but rather chose not to return to work"—both arose out of the same transaction or occurrence but that the defendant's second counterclaim, alleging the plaintiff's inadequate job performance after returning to work, did not. 971 F. Supp. 144, 147–48 (S.D.N.Y. 1997). The distinction in outcome between the two counterclaims in *Ginsburg* undermines FMSU's position that there is necessarily a sufficient logical relationship between a discriminatory termination claim and an unrelated on–the–job misconduct counterclaim to support ancillary jurisdiction.

In *Spencor v. Banco Real, S.A.*, 623 F. Supp. 1008, 1011–12 (S.D.N.Y. 1985), Judge Kram found that Banco Real's counterclaims based on allegations that plaintiff stole trade secrets during her employment bore "some factual relationship" to the plaintiff's claim that

Banco Real discriminated against her on the basis of her sex and national origin, but did "not arise out of the same transaction or occurrence for the purposes of invoking ancillary jurisdiction." In *Klein v. London Star Ltd.*, 26 F. Supp. 2d 689, 697–98 (S.D.N.Y. 1998), Judge Sweet found that the defendants' counterclaim alleging theft of trade secrets was sufficiently connected to Klein's claim of constructive discharge based on age discrimination because defendants' answer asserted that Klein resigned to avoid being discharged for his theft. As with the defendant's first counterclaim in *Ginsburg*, 971 F. Supp. at 147–18, because the defendants' counterclaim of trade secret theft tracked their defense to plaintiff's constructive discharge claim, it was a compulsory counterclaim "based on the same transaction and occurrence" that formed the basis of the action. *Klein*, 26 F. supp. 2d at 697–98.

Closer to supporting FMSU's position is *Deshaw v. Lord & Taylor*, No. 90 Civ. 0490 (JFK), 1991 WL 107271, *5 (S.D.N.Y. June 13, 1991), in which Judge Keenan found a logical relationship between the plaintiff's claim of age discriminatory discharge and the defendant's counterclaim that he violated company policy while in its employ by accepting gifts from outside vendors and failing to solicit competitive bids, including defendant's affirmative defense that after–acquired evidence of this conduct would have warranted termination, concluding that "[a]ny discovery concerning [plaintiff's] performance while employed by defendant is relevant to [defendant's counterclaim], and plaintiffs will not be prejudiced by burdensome discovery outside the scope of the initial claims and counterclaims asserted in this action." *Id.* at *2, *5.

Here, Defendants specifically disclaim any reliance on their after–acquired evidence defense for any purpose other the calculation of damages. (12/8/10 Tr. [Doc. # 197] at 40:24–41:7.) The cases discussed above do not stand for any presumption that

8

counterclaims alleging improper employment conduct against a plaintiff who brings a wrongful termination claim are necessarily compulsory, but instead reflect the general rule that only in those cases where the "essential facts" of the plaintiff's claim are so closely related to the facts required to prove the counterclaim that resolving both in one suit would promote judicial efficiency. *See Jones*, 358 F.3d at 210. Because the facts concerning Weber's unknown misconduct at some point during his employment, which do not figure in any way into the reason for his discharge, are not essential to the resolution of Weber's claims, FMSU's counterclaims do not bear a "logical relationship" to Weber's discriminatory discharge claims and are thus not compulsory. *See id.* at 209–10.

Since FMSU's counterclaims are permissive, and without an independent basis of jurisdiction, the Court may not exercise its ancillary jurisdiction over the counterclaims. *See Federman*, 597 F.2d at 812. FMSU does not dispute that its counterclaims are all brought under state law (*see* FMSU Answer at 20–38), nor does it dispute that Weber and FMSU are both citizens of New York by virtue of FMSU's incorporation in that state. Accordingly, the Court has no basis to exercise either federal question jurisdiction under 28 U.S.C. § 1331 or diversity of citizenship jurisdiction under § 1332.

FMSU argues that the Court should nonetheless exercise supplemental jurisdiction over the claims pursuant to the Second Circuit's observation in *Jones*, 358 F.3d at 212–13, that after passage of 28 U.S.C. § 1367, "it is no longer sufficient for courts to assert . . . that permissive counterclaims require independent jurisdiction," but instead permissive counterclaims need only satisfy the broad Article III "case" standard, which had been extended by § 1367 to confer supplemental jurisdiction on all claims with a "loose factual connection." The continuing vitality of this portion of *Jones* is, however, somewhat dubious,

9

considering that later in the same year, the Second Circuit, without mentioning *Jones*, abandoned this "loose factual connection" standard and applied the traditional "common nucleus of operative fact" standard in analyzing supplemental jurisdiction over a state law claim. *Briarpatch Ltd., L.P. v. Phoenix Pictures, Inc.*, 373 F.3d 296, 308 (2d Cir. 2004).[1] The Second Circuit has not since revisited or relied on *Jones* in discussing supplemental jurisdiction.

Even if the Court were to apply the "loose factual connection" standard rather than the "logical relationship" standard, FMSU's counterclaims remain too factually dissimilar from Weber's discriminatory discharge claims for the Court to exercise supplemental jurisdiction. FMSU's allegations with respect to the Collins payments simply have no factual connection, even a loose one, to Weber's claims. Although both Weber's claims and FMSU's counterclaims relate to aspects of Weber's employment, this is a far looser connection than in *Jones*, where both the claims and counterclaims pertained to a singular event—the purchase of a car. There is no similar unifying event between Weber's claims and FMSU's counterclaims, rather both sets of claims merely concern, in the broadest sense, that Weber worked at FMSU.

Because Weber's claims and FMSU's counterclaims share neither a "logical relationship" nor a "loose factual connection" the Court will not exercise ancillary or

---

[1] *See also Burgess v. Omar*, 345 F. Supp. 2d 369, 371 & n.1 (S.D.N.Y. 2004), in which the Southern District of New York exercised supplemental jurisdiction over state law claims that derived from the same "nucleus of operative fact" as the "jurisdiction–conferring claim" and determined that "[t]he dictum in *Jones* . . . does not warrant a different conclusion particularly in light of *Briarpatch* . . . in which the Circuit subsequently adhered to the traditional view without even citing *Jones.*"

supplemental jurisdiction over FMSU's counterclaims. FMSU's counterclaims are therefore dismissed.

B.     The Timeliness of FMSU's Counterclaims

Weber also moves to dismiss FMSU's tort–based counterclaims (Counts I–VIII, and X–XII) under Federal Rule of Civil Procedure 12(b)(6) as time–barred because FMSU brought the counterclaims more than three years after the action complained of—Weber's authorization of payments to and on behalf of Ms. Collins—and no tolling of this three–year statute of limitations by allegations of fraudulent concealment cure the untimeliness because FMSU has not plead fraudulent concealment with the particularity required by Rule 9(b). (Mem. Supp. at 14–22.)  Weber also argues that FMSU has failed to state a claim for breach of fiduciary duty (Count II) upon which relief can be granted with respect to Weber's alleged instructions to Brian Higgins to shred SERP plan documents because FMSU, by its own account of the facts, did not sustain damages as the result of this instruction because Higgins refused to carry it out.  (*Id.* at 22–23.)  Because the Court lacks jurisdiction over any of FMSU's counterclaims, it will not address Weber's arguments with respect to the counterclaims sounding in tort.

IV. Conclusion

For the reasons stated above, Weber's Motion to Dismiss [Doc. # 119] FMSU's Counterclaims is GRANTED.

IT IS SO ORDERED.

/s/
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 28th day of February, 2011.