UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| John J. Weber,<br>     *Plaintiff*,<br><br>     *v.*<br><br>FUJIFILM Medical Systems U.S.A., Inc., Hiroaki<br>Tada, FUJIFILM Holdings America Corporation,<br>and FUJIFILM Corporation,<br>     *Defendants.* | Civil No. 3:10cv401 (JBA)<br><br><br><br><br>February 24, 2012 |

RULING ON DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

On July 21, 2010, Plaintiff John J. Weber filed a Third Amended Complaint against FujiFilm Medical Systems U.S.A., Inc. ("FMSU"), Hiroaki Tada, FujiFilm Holdings American Corporation ("HLUS"), FujiFilm Holdings Corporation ("FH"),[1] and FujiFilm Corporation claiming a variety of causes of action as the result of his termination from FMSU.  Defendants FMSU and Tada [Doc. # 252], HLUS [Doc. # 253], and FujiFilm Corporation [Doc. # 254] move for summary judgment in their favor on Plaintiff's Third Amended Complaint.  For the reasons that follow, Defendants' motions for summary judgment will be granted in part and denied in part.

I.      Undisputed Facts

        A.      Weber's Employment

In 1986, Mr. Weber joined Pyne Corporation as Vice–President and Chief Financial Officer; Fuji Photo Film Co., Ltd. acquired Pyne Corporation in December 1986 and changed its name to Fuji Medical Systems U.S.A., Inc.  (Sakurai Dec. [Doc. # 252–8] ¶ 3.)

---

[1] The Court dismissed [Doc. # 200] the Third Amended Complaint as to Defendant FH on February 4, 2011 for lack of personal jurisdiction.

Fuji Medical Systems U.S.A., Inc. changed its name to FMSU in 2000.  (Oakley Dec. [Doc. # 252–12] ¶ 6.)  At the time of his hiring, Mr. Weber and Pyne entered into an Employee Agreement that provided:

> Should the Company determine that the Executive's services are no longer required for reasons other than normal retirement, death, physical or mental disability or cause, defined as wilful malfeasance which would tend to have a material adverse effect on the Company, such termination shall be deemed to be termination without cause, and the Executive shall be entitled to receive his full base salary and any and all benefits at the rate then in effect for a period of one year following such termination.

(Employment Agreement, Ex. H to Murphy Dec. [Doc. # 252–3] at 2.)  Mr. Weber testified during his deposition that he held various positions with FMSU, including Executive Vice President and Senior Vice President of Operations.  (Weber Dep., Ex. B to Murphy Dec. at 61:16–62:4.)

>     B.     Tada's Concerns

Hiraoki Tada, President of FMSU from April 2008 through March 2010, testified during his deposition that at some point during his tenure he "believe[d] that we needed to raise the level of management in the company, so therefore, in order for that to happen we were gonna have to ask Mr. Weber to leave at sometime in the future."  (Tada Dep., Ex. C to Murphy Dec. at 100:14–17.)  Mr. Tada also testified that he understood that "there was too much power" given to Weber in that most of the decision making was going through only him.  (*Id.* at 45:1–18.)  Mr. Tada decided to take sales responsibility away from Weber at an unspecified point in time because he "didn't see that there was . . . a strategy for sales" and was concerned about inadequacies in the collection and recording of budget and customer data.  (*Id.* at 82:18–83:18.)  He also testified that FMSU "needed to make an

organizational change" because of concerns that "[i]t was an operation which was based on just doing day–to–day operations based on that day's sales and reacting to that information that came in on that day." (*Id.* at 211:6–13.)

      C.     KPMG Audit

On October 15, 2008, HLUS informed FMSU that a corporate compliance audit would be conducted to ensure that FMSU was adhering to HLUS policies. (Audit Notice, Ex. A to File Dec. [Doc. # 252–10].) Mr. Tada testified that the audit was performed so that Fuji Medical Japan would be able to meet the Japanese Sarbanes–Oxley requirements. (Tada Dep. at 264:10–15.) Mr. Weber states in his affidavit, however, that while he was "told the purpose of the KPMG review was to assess FMSU's compliance with the Japanese Sarbanes–Oxley Act ("JSOX"), FMSU was not subject to JSOX and even companies subject to it were not expected to be compliant until March 31, 2009." (Weber Aff., Ex. 1 to Pl.'s Loc. R. 56(a)1 Stmt. ¶ 24.)

The KPMG audit report ("Report") found: "In general, the internal controls appear weak and in need of significant improvements. Based on the findings, there is a lack of effective management oversight at FMSU." (KPMG Report, Ex. K to Murphy Dec. at 4.) The Report additionally found that "[m]anagement at FMSU was aware of non–compliance with certain company policies and effectively condoned the non–compliance by non–action"; that "[t]he company is at risk of business disruption"; that "[t]he internal control environment at FMSU appears weak and immature and in need of significant improvements"; and that "[b]ased on the findings of this report, FMSU's current internal control environment will not pass the scrutiny and internal control requirements under JSOX." (*Id.* at 4–5.)

Ryutara Hosoda, President of HLUS, testified that he had "a very strong understanding that after reading the KPMG Report there [were] managerial issues at FMSU," but also testified that "I haven't said anything that it was Mr. John Weber's fault" and that "there is no . . . person that I could say this person is to blame." (Hosoda Dep., Ex. 29 to Pl.'s 56(a)2 Stmt. at 137:10–138:21.) Mr. Hosoda also testified that the KPMG Report revealed that there "were a lot of problems with [FMSU's] operational processes" and that Mr. Tada had the responsibility to make sure that these operational processes were corrected. (*Id.* at 88:7–25.)

Mr. Tada testified that the there were "a lot of points in the KPMG audit that meshed with the thoughts that I had about what I had witnessed in the company" including undocumented loans made by FMSU. (Tada Dep. at 263:9–24.) After the KPMG audit, Mr. Tada took action in response to points in the Report, including creating a "database of who was receiving advance pay," going through all checks written by FMSU employees, including John Weber, before those checks went out, and lowering the limits on corporate credit cards. (*Id.* at 269:1–20.) Mr. Tada also testified that after the KPMG Report, he placed Mr. Weber in charge of "compliance issues for FMSU." (*Id.* at 307:10–13.)

FMSU prepared a response to the KPMG audit Report ("Response"), which was coordinated by Gehr Brown and contributed to by other Fuji personnel including Peter Guyton, Steve Wobschall, Keith Roth, and Ken Ostrowsky; Mr. Weber reviewed the response and "helped author certain pieces."[2] (Weber Dep. at 98:7–100:11.) Mr. Tada

---

[2] Defendants refer to the Response as "Weber's Response," however nothing in the Response indicates that it was authored or coordinated by Weber (*see* Response, Ex. L to Murphy Dec.) and Weber testified that Gehr Brown coordinated its preparation (Weber Dep. at 98:7–100:11). Mr. Tada, however, identified the Response as "comments from John

testified that upon reading the Response, "on almost all the items I remembered not being satisfied with the answers." (Tada Dep. at 265:22–266:2.)

>    D.    Empiric Filing

FMSU acquired Empiric Systems, LLC ("Empiric") in either October 2006 or October 2008.[3] (File Dec. ¶ 7; Pl.'s 56(a)2 Stmt. ¶ 55.) On October 1, 2009, Empiric and FMSU filed Articles of Merger with the North Carolina Secretary of State, merging Empiric into FMSU, with FMSU as the surviving entity; Mr. Weber signed the document as "EVP." (Articles of Merger, Ex. C to File Dec.) On October 14, 2009, Jonathan File sent an email to Mr. Tada, attaching the Articles of Merger and informing Mr. Tada that he "was not aware of the merger," that he did not think that Empiric and FMSU had signed a plan of merger agreement, that he did not think that the Empiric and FMSU members and directors had approved the merger, and that Weber did not have authority to sign the document. (10/14/2009 File E–mail, Ex. B to File Dec.) Mr. File states in his declaration that "Mr. Weber's unauthorized actions by signing the 'Articles of Merger' document violated the Standards of Business Conduct and Compliance with Law Program." (File Dec. ¶ 13.) Although he could not recall exactly what provision of the standard business and ethics policy Mr. Weber violated in executing the merger, Mr. Tada testified during his deposition that "for a person who doesn't have the authorization to do something where he merged two companies into one is [a] violation." (Tada Dep. at 310:10–311:24.)

---

Weber" during his deposition. (Tada Dep. at 265:13–21.)

[3] Jonathan File, former General Counsel of HLUS, states in his affidavit that FMSU acquired Empiric in October 2006, however Plaintiff claims in his 56(a)2 Statement that the acquisition took place in October 2008.

On October 14, 2009, Mr. Tada e–mailed Mr. Weber, asking him to "explain the background" of the merger.  (10/14/2009 Tada E–mail, Ex. M to Murphy Dec.)  In response, Weber forwarded to Tada an e–mail from Jim Morgan, director of marketing at FMSU, which told Weber that as part of the Empiric acquisition "the realty company wants an official filing with the North Carolina Secretary of State that indicates Empiric LLC is now FMSU." (10/14/2009 Weber E–mail, Ex. N to Murphy Dec.)  Mr. Weber wrote the following to Tada: "Jim Morgan sent this to me and Rick Rohan on 9/14/09 (attached) so that we could register the merger of FMSU and Empiric and change the name on the door to FMSU. Apparently the merger documents have not yet been prepared or received board approval. Not sure why I can't sign as E.V.P. of FMSU.  I spoke to Rick Roahan and he will look in to it and clean it up.  It looks like I made a mistake and jumped the gun.  I will let you know what Rick says.  I'll also contact Jonathan, if you wish."  (*Id.*)

On October 27, 2009, Mr. Tada e–mailed Mr. File about a meeting scheduled for 3:00 p.m. that afternoon with Mr. Weber "about mis–filing at State of NC." (10/27/2009 Tada E–mail to File, Ex. O to Murphy Dec.)  Hisanori Makaya sent an e–mail to Tada on October 27, describing the plan for the meeting: "we would like to have an inquiry held for John Weber as soon as possible, attended by the President of HLUS, HLUS legal, and the President of FMSU.  Only after this will a decision be made regarding whether he will be retired or dismissed, and when to make this announcement." (10/27/2009 Makaya E–mail, Ex. 43 to Pl.'s 56(a)2 Stmt.)

The October 27 meeting took place at HLUS' corporate headquarters in Valhalla, New York and was attended by Mr. File, Mr. Hosoda, Mr. Tada, and Mr. Weber.  (Weber Dep. at 140:8–141:2.)  Weber testified that during the meeting, Mr. File said that the purpose

of the meeting was to discuss the Empiric filing, and that "he considered it to be a serious violation of . . . the contract administration policy . . . which could lead to criminal charges, both to me and the company, for filing a false statement." (*Id.* at 142:2–10.)

E.     Weber's Termination

FMSU terminated Mr. Weber' employment on December 14, 2009; Mr. Weber testified: "I was told I was terminated with cause," and that Mr. Tada told him that "the main reason was the Empiric North Carolina filing" and also "mentioned" the KPMG audit report. (Weber Dep. at 79:9–24.) Mr. Tada testified that Weber's severance agreement indicated that he was being terminated for cause because the Empiric merger "was a major compliance violation." (Tada Dep. at 117:25–118:11.)

Mr. Weber claims that the Empiric merger and the KPMG audit report were pretext for his termination, and that he was instead fired as part of a "Fuji Tokyo" plan to transition from American managers to younger Japanese managers. (Pl.'s 56(a)2 Stmt. ¶¶ 74–75.) He points to several documents in the record in support of his claim:

(1) A November 2007 FMSU audit including the comment: "We believe that it is now the time to reevaluate whether John Weber and his old team would be enough to handle the change in the profit structure." (Nov. 2007 Audit, Ex. 18 to Pl.'s 56(a)2 Stmt.)

(2) A July 14, 2009 memorandum from Mr. Nakamura to Mr. Komori and Mr. Takahashi, which responded to Mr. Komori's question: "I heard that the top American staff member is a cancer. Any update?" (7/14/2009 Nakamura Memo, Ex. 22 to Pl.'s 56(a)2 Stmt.) Mr. Nakamura's answer stated: "Concentration of authority in J. Weber is more intense and broad–ranged than initially anticipated. In addition, internal rules were never documented and he had to be consulted for every little decision in the previous structure,

7

making the company's operation very time–consuming.  However, removal of J. Weber's authority is progressing in the manner shown below, and we are planning to have him resign by the time of completing accounting settlement for this year–end (around May 2010) at the latest."  (*Id.*)

(3) A July 28, 2009 memorandum written by Mr. Tada stated that the tasks assigned to him as the head of FMSU were to "[r]ecover the control over management from American staff members to Japanese staff members, and create the management foundation for future progress within two years."  (7/28/09 Tada Memo, Ex. 20 to Pl.'s 56(a)2 Stmt.)

(4) Mr. Tada's handwritten notes from October 25 and 26, 2009, which note: "[This person/these people] over here, there's no telling what [he/she/they] will do when emotional."  (10/25/09 Tada Notes, Ex. 23 to Pl.'s 56(a)2 Stmt.)

(5) An October 24, 2009 memorandum written by Mr. Tada entitled "Merger with Empiric," which, in addressing the problems with the Empiric merger, notes: "The possibility also cannot be denied that there was less attention paid than usual, because at the time pressure was starting to be applied towards resignation by the end of this year (with the target of mid–November) as one of the measures for returning FMSU management, which was largely dominated by Americans, to the Japanese, after receiving approval from the president."  (10/24/2009 Tada Memo, Ex. 25 to Pl.'s 56(a)2 Stmt.)

(6) A December 2, 2009 memorandum written by Mr. Tada entitled "JW Countermeasure" includes notes that "JW's contribution over his twenty–three years of service is appreciated; however, the company must overhaul its management approach and improve the overall level in order to ensure future advancement in FMSU," and that Tada

himself "will also be resigning at the end of March to leave the task to the younger generation." (12/2/2009 Tada Memo, Ex. 24 to Pl.'s 56(a)2 Stmt.)

(7) An October 29, 2009 e–mail from Mr. Tada to managing director Takahashi, with the subject line "FW: Meeting on Empiric Merger into FMSU Attorney Client Privileged," which reads: "I am sorry to trouble you with this issue.  The condition for rebuilding the FMSU management base is his retirement, and so if this is resolved, I am prepared for some amount of confusion, but reforms with the new head of HR can proceed.  Until now, it felt as though we were parachuting solo in the middle of enemy camp, not even just landing in the face of the enemy, but we will finally have the strong ally needed for reformation in the new HR director." (10/29/2009 Tada E–mail to Takahashi, Ex. 26 to Pl.'s 56(a)2 Stmt.)

F.      Reassignment of Weber's Duties, Other Terminations, and New Managers

During his time at FMSU, Weber's "sales responsibility" was taken away and given to Mr. Tada, and his regulatory, "ordered through receipt" ("OTR"),[4] commercial, human resources, and marketing responsibilities were also taken away.   (Weber Dep. at 106:2–107:6.)   Manfred Richter, who is not Japanese, took over Mr. Weber's OTR responsibilities.   (*Id.* at 107:16–22.)   Mr. Richter reported to Mr. Tada.   (*Id.*)   During his deposition, Weber was uncertain of who took over his regulatory responsibilities; he did not believe it was Mr. Hishinuma, but stated that it was another person of Japanese origin.   (*Id.* at 107:10–15.)   After Mr. Weber was terminated, some of his financial responsibilities were assigned to Mr. Nagasawa, who was hired as treasurer for FMSU in June or July 2009, and was of Japanese origin and under 40 years of age.   (*Id.* at 133:6–23; Tada Dep. at 102:7–18,

---

[4] Mr. Weber testified that ordered through receipt is "the whole process of taking an order, billing and collecting."  (Weber Dep. at 106:16–20.)

104:18–104:24.)  Keith Roth, FMSU's Controller, also took over a portion of Mr. Weber's financial responsibilities after he was terminated; Mr. Roth is a Caucasian American citizen. (Oakley Aff. ¶¶ 9–10.)

Mr. Tada testified during his deposition that no other FMSU employees who were involved in the Empiric merger were terminated after the merger.  (Tada Dep. at 319:6–321:24.)  In the several years before and after Mr. Weber's termination, FujiFilm subsidiaries terminated other executives near or over the age of 60 who were of non–Japanese origin, including Albert Aerts, Ed Carhart, Joseph Convery, Jonathan File, and Stan Freimuth.  (3/8/2011 Tuttle Letter, Ex. F to Cortese–Costa Cert.)  Albert Aerts was terminated on March 17, 2010 due to "restructuring," at which point he was 61.  (Exs. F, G to Cortese–Costa Cert.)  Ed Carhart was terminated on April 7, 2010 due to "restructuring," at which point he was 58.  (*Id.*)  Joe Convery was terminated on May 5, 2008 due to "reduction in force," at which point he was 65.  (*Id.*)  Jonathan File was terminated on December 30, 2009 due to "restructuring," at which point he was 59.  (*Id.*)  Stan Freimuth was terminated on January 24, 2007 due to "position elimination," at which point he was 61. (*Id.*)  After Mr. File was terminated,  Mr. Sano, who worked in Japan, took over his job duties, and according to Mr. Hosoda, "would be made available . . . from Japan."  (Hosoda Dep. at 30:24–32:18.)

II.      Discussion[5]

    A.       The Friendship, Commerce, and Navigation Treaty

All Defendants argue that Plaintiff's national origin and ancestry claims in Counts Thirteen through Sixteen are barred by the Friendship, Commerce, and Navigation Treaty ("FCN Treaty") between the United States and Japan.  Plaintiff argues that the FCN Treaty does not apply to American subsidiaries and that, in any event, the Treaty would not bar his national origin discrimination claims in this case.

Article VIII(1) of the FCN Treaty authorizes "companies of either Party [the U.S. and Japan], to engage, within the territories of the other Party . . . executive personnel . . . of their choice."  Treaty of Friendship, Commerce and Navigation, U.S.–Japan, art. VIII(1), Apr. 2, 1953, 4 U.S.T. 2063.  Under the Treaty, Japanese companies "have the right to choose citizens of their own nation as executives because they are such citizens."  *Fortino v. Quasar Co.*, 950 F.2d 389, 393 (7th Cir. 1991) (quoting *MacNamara v. Korea Air Lines*, 863 F.2d 1135, 1144 (3d Cir. 1988)).  However, while the FCN Treaty allows a Japanese company to exercise a preference for Japanese citizens, it does not permit discrimination on the basis of national origin in violation of Title VII.  *Id.* at 392.  The Seventh Circuit in *Fortino* found the

------

[5] "Summary judgment is appropriate where, construing all evidence in the light most favorable to the non-moving party," *Pabon v. Wright*, 459 F.3d 241, 247 (2d Cir. 2006), "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56(c)(2). An issue of fact is "material" if it "might affect the outcome of the suit under the governing law," and is "genuine" if "a reasonable jury could return a verdict for the nonmoving party" based on it. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Unsupported allegations do not create a material issue of fact." *Weinstock v. Columbia Univ.*, 224 F.3d 33, 41 (2d Cir. 2000).

distinction between citizenship and national origin particularly muddled with respect to the

FCN Treaty:

> Especially in the case of a homogenous country like Japan, citizenship and
> national origin are highly correlated; almost all citizens of Japan were born
> there.  But to use this correlation to infer national–origin discrimination
> from a treaty–sanctioned preference for Japanese citizens who happen also
> to be of Japanese national origin would nullify the treaty. . . . The exercise of
> a treaty right may not be made the basis for inferring a violation of Title VII.
> . . . That right would be empty if the subsidiary could be punished for
> treating its citizen executives differently from American executives on the
> ground that, since the former were of Japanese national origin and the latter
> were not, it was discriminating on the basis of national origin.

*Id.* at 392–93.  *Fortina* held that the defendant, Quasar Co., did not violate Title VII by

exhibiting a preference for executives with Japanese citizenship over those with U.S.

citizenship because "there is no evidence of discrimination here save what is implicit in

wanting your own citizens to run the your foreign subsidiary." *Id.* at 393.

The Seventh Circuit declined to separate the close correlation between national

origin and citizenship in the absence of evidence that suggested the discrimination suffered

by the plaintiffs was based strictly on national origin rather than citizenship.  Judge Posner

gave examples of the type of evidence that would have satisfied this inquiry: evidence that

if plaintiff Fortino had Japanese relatives he would not have been fired or evidence of

favoritism shown by Quasar to Japanese–American employees over other American

employees.  *Id.*  The FujiFilm entities' counsel relied at oral argument on this segment of

*Fortino*, claiming that the record in this case does not support Mr. Weber's distinction

between citizenship and national origin because he "admits and acknowledges that he does

not know of any Japanese Americans who were favored."  Although Defendants are correct

that nothing in the record supports a claim that Japanese Americans were favored over Mr.

Weber, Plaintiff does point to evidence in the record that supports an inference that Defendants' decision to terminate Mr. Weber was based on national origin rather than an FCN–protected desire to choose Japanese citizens for leadership positions.

Some of the documents in the record display nothing more than a FujiFilm preference for having Japanese citizens run its subsidiaries: the July 28, 2009 Tada memorandum discussing "[r]ecover[ing] the control over management from American staff members to Japanese staff members" (7/28/09 Tada Memo) and the October 24, 2009 Tada memorandum discussing "measures for returning FMSU management, which was largely dominated by Americans, to the Japanese, after receiving approval from the president" (10/24/2009 Tada Memo) could suggest that FujiFilm merely intended to choose citizens of Japan as its executives, activity expressly protected by the FCN Treaty.  *See Fortino*, 950 F.2d at 392–93.

However, other documentary evidence could allow reasonable jurors to infer a pattern of more invidious discrimination by FujiFilm executives on the basis of national origin.  An October 29, 2009 e–mail from Mr. Tada discusses "enemy camp," which could support the inference that FujiFilm was not acting on a mere preference for Japanese citizens, but was motivated by a more discrete animus towards those of American national origin: "Until now, it felt as though we were parachuting solo in the middle of enemy camp, not even just landing in the face of the enemy, but we will finally have the strong ally needed for reformation in the new HR director."  (10/29/2009 Tada E–mail.)  Mr. Tada's handwritten notes from October 25 and 26, 2009, depending on the translation used, display a similar use of disparaging language that could support an inference of national origin discrimination beyond a mere citizenship preference; Mr. Tada, according to one

13

translation, writes: "These people over here, there's no telling what they will do when emotional."  (10/25/09 Tada Notes.)

This evidence, suggestive of discriminatory intent beyond the preferences permitted by the FCN Treaty, was wholly lacking in *Fortino*, and thus the record here does not undisputedly demonstrate that Japanese citizenship, or lack thereof, "was the real source of the 'prejudice'" against John Weber.  950 F.2d at 393.  In *Fortino*, the only evidence of discrimination was that during a Quasar reorganization, three American executives of non–Japanese origin were discharged where all of the Japanese citizen executives kept their jobs.  *Id.* at 392.  Mr. Weber does not rely exclusively on evidence of preference towards Japanese citizens, as did the plaintiffs in *Fortina*, but instead points to written evidence in the record of hostile language such as "enemy camp" and "these people over here" that could lead a reasonable juror to infer that Defendants' decision to replace Mr. Weber was not based solely on a desire for an influx of Japanese citizen leadership, but an animus towards those of American national origin and ancestry.  The FCN Treaty therefore does not bar Mr. Weber's discrimination claims on summary judgment.

B.      Non–Discriminatory Reasons for Termination, Pretext, and Animus

Defendants also argue that they are entitled to summary judgment in their favor on Plaintiff's Title VII (Count Thirteen), CFEPA (Count Fourteen), and ADEA (Count Fifteen) claims because Mr. Weber's employer, FMSU, terminated him for legitimate, non–discriminatory business reasons and Weber is unable to demonstrate that the given reasons for his discharge were pretext.  Plaintiff argues in response that there is direct evidence of discriminatory animus, and under the appropriate mixed–motive analysis for his Title VII claim, Defendants are unable to show that they would have made the same

decision in the absence of their discriminatory motive.  Plaintiff also argues that even if the mixed–motive analysis is not applied,[6] he can establish a *prima facie* case of discrimination and that Defendants' proffered reasons for his discharge were pretext.

> ### 1. *Title VII and CFEPA*

There are two frameworks by which to analyze Title VII and CFEPA[7] disparate treatment claims: if a plaintiff can produce direct evidence of discrimination, then the "mixed–motive" analysis articulated in *Price Waterhouse v. Hopkins*, 490 U.S. 228 (1989) applies; if a plaintiff proffers only indirect evidence of discrimination, then the "pretext" analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973) applies.  *Ames v. Cartier, Inc.*, 193 F. Supp. 2d 762, 767 (S.D.N.Y. 2002).  Under *McDonnell Douglas*, a plaintiff has the burden of proving the elements of a *prima facie* case of discrimination, at which point the burden shifts to the employer to rebut the presumption of discrimination by producing evidence of a legitimate, non–discriminatory reason for the challenged action.  411 U.S. 792, 802–05 (1973).  If the employer is able to meet its burden, the employee may still prevail if he or she is able to establish that the non–discriminatory reason articulated for the employment decision was pretext.  *Id.* at 804–05.

---

[6] Although Plaintiff argues that the mixed–motive analysis applies to his Title VII claims, his counsel agreed at oral argument that this analysis does not apply to his ADEA claims, which must be analyzed under the *McDonnell Douglas* burden–shifting framework.

[7] Although, as discussed below, the Supreme Court held in *Gross v. FBL Financial Services*, 557 U.S. 167, 129 S. Ct. 2343, 2352 (2009), that the mixed–motive analysis does not apply to ADEA claims, neither Connecticut courts nor the Second Circuit have yet addressed the impact of *Gross* on CFEPA claims.  *See Herbert v. Nat'l Amusements, Inc.*, — F. Supp. 2d —, 2011 WL 2457552, *10 (D. Conn. 2011).  The Court will therefore apply the mixed motive analysis to Mr. Weber's CFEPA claims.

Under the mixed–motive analysis, "a plaintiff must demonstrate that 'a prohibited discriminatory factor played a motivating part in a challenged employment action.' Once the plaintiff has established that fact, the burden then 'shifts to the employer to prove by a preponderance of the evidence that it would have made the same decision anyway.'" *Ames*, 193 F. Supp. 2d at 767 (quoting *Raskin v. Wyatt*, 125 F.3d 55, 60 (2d Cir. 1997)).  To meet his or her burden, a plaintiff must prove that the employment decision "was made at least in part because of the illegitimate factor." *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1181 (2d Cir. 1992).  "[T]o survive a motion for summary judgment, a plaintiff must adduce sufficient direct evidence of discrimination that, if believed, would permit a reasonable jury to conclude that a discriminatory factor did, in fact, play a motivating role in the plaintiff's termination." *Ames*, 193 F. Supp. 2d at 767.  Considering the issue in the context of whether a plaintiff is entitled to a jury instruction regarding a mixed–motive discharge, the Second Circuit has addressed the types of evidence relevant to whether an employer had a mixed motive: "[If] the plaintiffs nonstatistical evidence is directly tied to the forbidden animus, for example *policy documents or statements of a person involved in the decisionmaking process* that reflect a discriminatory or retaliatory animus of the type complained of in the suit, that plaintiff is entitled to a burden–shifting instruction." *Fields v. N.Y. State Office of Mental Retardation & Developmental Disabilities*, 115 F.3d 116, 122 (2d Cir. 1997) quoting *Ostrowski v. Atlantic Mut. Ins. Cos*, 968 F.2d 171, 182 (2d Cir. 1992) (alterations in original)).

As discussed above, there is documentary evidence in the record from which a reasonable juror could conclude that discriminatory factors played a role in Defendants' decision to discharge Mr. Weber.  The memoranda discussing the plan to recover control over management from American staff members—which on their own would not be enough

16

to demonstrate improper discriminatory motive in this context—taken together with Mr. Tada's e–mails describing "the enemy" and "these people" could reflect a discriminatory animus towards employees of American national origin.   As "policy documents or statements of a person involved in the decisionmaking process that reflect a discriminatory animus," *Fields*, 115 F.3d at 122, these e–mails satisfy Mr. Weber's burden to adduce evidence that would permit a reasonable jury to conclude that national origin and ancestry discrimination played a motivating role in his termination.  *See Ames*, 193 F. Supp. 2d at 767.

With Plaintiff having satisfied this mixed–motive burden, Defendants have not shown that the undisputed facts demonstrate that they would have made the same decision to terminate Weber regardless of his national origin or ancestry.  In fact, in their Reply, Defendants focus only on the pretext argument, arguing that Mr. Weber's errors in the Empiric merger and the findings of the KPMG audit were the reason for his firing; they do not point to any evidence in the record that shows that they would have decided to fire him after those events even if he had not been American.  Although the record reveals several major missteps by Mr. Weber in the Empiric merger, and the results of the KPMG audit would give a company cause for concern, to survive summary judgment, Mr. Weber need only "adduce sufficient direct evidence of discrimination that, if believed, would permit a reasonable jury to conclude that a discriminatory factor did, in fact, play a motivating role in the plaintiff's termination."  *Ames*, 193 F. Supp. 2d at 767.  He has met this burden, and Defendants have not met their burden to show that they would have made the same decision to terminate Weber in the absence of national origin considerations.

17

### 2.      ADEA

Although the mixed–motive analysis can apply to Title VII claims for which there is direct evidence of discriminatory animus, it is inapplicable to ADEA claims.  *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 105–06 (2d Cir. 2010) (citing *Gross v. FBL Fin. Servs.*, 557 U.S. 167, 129 S. Ct. 2343 (2009)).  Instead, "'a plaintiff bringing a disparate treatment claim pursuant to the ADEA must prove, by a preponderance of the evidence, that age was the 'but–for' cause of the challenged adverse employment action' and not just a contributing or motivating factor."  *Id.* at 106 (quoting *Gross*, 129 S. Ct. at 2352).

Mr. Weber points to evidence from which a reasonable juror could conclude that Defendants acted with discriminatory intent with respect to age, including the 2007 FMSU audit questioning "whether John Weber and his old team would be enough to handle the change in the profit structure" (Nov. 2007 Audit), and Mr. Tada's statement of intent "to leave the task to the younger generation" (12/2/2009 Tada Memo).  Defendants, however, point to Mr. Weber's "management errors, excesses and misfeasance" (FMSU Mem. Supp. [Doc. # 252–1] at 22), as shown by the KPMG Audit and his mishandling of the Empiric filing, as evidence of a legitimate, non–discriminatory reason for their decision to terminate Mr. Weber.

In light of Defendants' counter–evidence of non–discriminatory performance–related reasons for terminating Mr. Weber, the Court must determine whether Mr. Weber "has raised sufficient evidence upon which a reasonable jury could conclude by a preponderance of the evidence that [his] age was a 'but for' cause" of Defendants' termination decision, i.e. whether a reasonably jury could infer from the evidence that the non–discriminatory reasons for firing Mr. Weber were  pretextual. *Gorzynski*, 596 F.3d at

107.  In *Gorzynski*, plaintiff Diane Gorzynski received a negative performance evaluation prior to her termination, however the Second Circuit held that "the evaluation occurred under circumstances suggesting discriminatory motives" where her evaluator had been supervising her for only a week, she had never previously had a disciplinary write–up, a contemporary anonymous evaluation gave her a much higher review, and the evaluator that gave her a negative evaluation gave another employee a much more favorable evaluation even though he had been "written up and verbally counseled on numerous occasions throughout the preceding year." *Id.* at 107–08.  The Second Circuit also held that evidence of Ms. Gorzynski's satisfactory performance during a probationary period prior to her termination, defendant Jet Blue's "questionable" investigations of complaints about Ms. Gorzynski, and the fact that "other younger employees were not disciplined for violating numerous policies" was sufficient evidence that age discrimination, rather than defendant Jet Blue's proffered non–discriminatory justifications, were a but–for cause of Ms. Gorzynski's termination.  *Id.* at 108–09.

Mr. Weber points to evidence in the record that could similarly give rise to a reasonable inference that Defendants' reaction to the KPMG audit and Empiric filing "occurred under circumstances suggesting discriminatory motives."  More than a year before the KPMG audit and almost two years before the Empiric filing, Mr. Tada began questioning the abilities of "Mr. Weber and his old team."  (Nov. 2007 Audit.)  Mr. Tada later expressed a desire to leave the task of overhauling FMSU's management approach "to a younger generation."  (12/2/2009 Tada Memo.)  No other FMSU employees involved in the Empiric filing were terminated (Tada Dep. at 319:6–321:24), and around the time FMSU terminated Mr. Weber's employment, other FujiFilm subsidiaries fired executives near or over the age

of 60 (*see* Exs. F, G to Cortese–Costa Cert.).  A reasonable juror could infer from this evidence that Defendants' proffered non–discriminatory reasons for firing Mr. Weber were pretext, and that but–for Mr. Weber's age, he would not have been fired.  Defendants are therefore not entitled to summary judgment on Mr. Weber's ADEA claims.

> C.      Section 1981

Defendants argue that they are entitled to summary judgment on Mr. Weber's claims under 42 U.S.C. § 1981 in Count Sixteen of his Third Amended Complaint because he has not demonstrated that he suffered a discriminatory act motivated by a discriminatory animus towards a minority group.  Mr. Weber's counsel asserted at oral argument that a white male can bring a Section 1981 claim asserting his own right not to be discriminated against as a white person, without tying his claim to the rights of any minority group.

*Burbank v. Office of the Attorney General*, 240 F. Supp. 2d 167 (D. Conn. 2003), expressly refutes Plaintiff's argument, explaining that "[a] non–minority plaintiff may bring a § 1981 action only under certain circumstances."  *Id.* at 175 (collecting cases).  "The threshold showing is that a non–minority plaintiff was 'punished for trying to vindicate the rights of minorities protected by [the statute].' . . . Accordingly, a non–minority plaintiff may bring a § 1981 claim if the discrimination against him was motivated by animosity towards the race of a third party who is a member of a racial minority group."  *Id.* (quoting *Sullivan v. Little Hunting Park, Inc.*, 396 U.S. 229, 237 (1969)).  Nothing in the record here suggests that the discrimination against Mr. Weber was motivated by animosity towards a racial minority group, nor does Mr. Weber claim that the discrimination was so motivated.  Defendants are therefore entitled to summary judgment in their favor on Mr. Weber's claims under 42 U.S.C. § 1981, and Count Sixteen of the Third Amended Complaint is dismissed.

D.     Breach of Contract and the Covenant of Good Faith and Fair Dealing

FMSU moves for summary judgment in its favor on Plaintiff's claims for breach of contract (Count One) and breach of the implied covenant of good faith and fair dealing (Count Two), asserted only against Defendant FMSU.  It argues that because it terminated Weber for cause—"specifically, Weber's long–term reckless management of FMSU, as revealed by the 2009 KPMG Audit, and his intentional disregard of the Company's Standards of Business Conduct and Compliance with Law Program arising out of the Empiric Filing"—it did not breach its employment agreement with him or act in bad faith. (FMSU Mem. Supp. at 29–30.)  Mr. Weber responds that FMSU's breach and its bad faith conduct are demonstrated by evidence that its plan to terminate him arose before the KPMG audit and Empiric merger and was motivated by discriminatory animus.

FMSU had decided to phase out Mr. Weber and his "old team" as early as 2007: "We believe that it is now the time to reevaluate whether John Weber and his old team would be enough to handle the change in the profit structure."  (Nov. 2007 Audit.)  As discussed above, a reasonable juror could conclude based on the evidence in the record that FMSU acted with discriminatory intent in terminating Mr. Weber, and used his poor job performance as pretext.  A reasonable juror could also therefore conclude that FMSU did not terminate Mr. Weber for cause, but instead acted in bad faith.  FMSU's motion for summary judgment on Counts One and Two is accordingly denied.

E.     Defamation

Defendants move for summary judgment in their favor on Mr. Weber's defamation claim (Count Six), asserted against FMSU, Mr. Tada, and HLUS, arguing that the allegedly defamatory statements were not made by Mr. Tada, that the statements are true, and that

21

the statements are subject to the intra–corporate privilege.  Mr. Weber argues that he was defamed when FMSU falsely published its official notice of termination and that Mr. Weber had been terminated for cause, and that these statements are not subject to the privilege because they were made with malice.

"To establish a prima facie case of defamation, the plaintiff must demonstrate that: (1) the defendant published a defamatory statement; (2) the defamatory statement identified the plaintiff to a third person; (3) the defamatory statement was published to a third person; and (4) the plaintiff's reputation suffered injury as a result of the statement." *Cweklinsky v. Mobil Chem. Co.*, 267 Conn. 210, 217 (2004).  Defamatory statements include those charging "improper conduct or lack of skill or integrity in one's profession or business and . . . of such nature that [they are] calculated to cause injury to one in his profession or business." *Miles v. Perry*, 11 Conn. App. 584, 601 (1987).  Here, Mr. Weber claims that the statements made by Mr. Tada and others that Weber had been terminated for cause were defamatory.  There exists in the record sufficient evidence from which a reasonable juror could conclude that these representations that Weber was terminated for cause were both false and damaging to Mr. Weber's professional reputation.

There nonetheless exists a qualified privilege with respect to defamation for "intracorporate communications in the context of employment decisions." *Gambardella v. Apple Health Care, Inc.*, 291 Conn. 620, 630 (2009).  This privilege does not apply, however, where "the holder of the privilege acted with malice in publishing the defamatory material." *Id.*  "[M]alice is not restricted to hatred, spite or ill will against a plaintiff, but includes any improper or unjustifiable motive." *Id.*  There is evidence in the record that Mr. Weber was not, in fact, fired for cause, but as part of a pattern of discriminatory animus.  Evidence of

this animus precludes summary judgment on Mr. Weber's defamation claim because it may demonstrate "improper or unjustifiable motive" in connection with his termination and the subsequent publication that he had been fired for cause.  Defendants' motion for summary judgment on Count Six is therefore denied.

> F.    Excess Benefit SERP Claims

FMSU moves for summary judgment in its favor on Mr. Weber's claims in connection with the "excess benefit SERP" he claims FMSU owed him, arguing that "[n]ot a single document or witness corroborates Weber's claim that FMSU misrepresented his SERP benefit."  (FMSU Mem. Supp. at 33.)  Mr. Weber's counsel agreed at oral argument that Counts Seven (breach of excess benefit SERP), Eight (breach of the implied covenant of good faith and fair dealing), Nine (misrepresentation), Ten (promissory estoppel), and Twelve (ERISA) each require evidence of the existence of the alleged excess benefit SERP, however Weber argues that such a SERP does exist, as does his right to payment under that SERP.

Weber claims that the following pieces of evidence support his claim that an excess benefit SERP existed at FMSU: 1) a chart of limitations for an unspecified SERP benefit for the years 1997 through 2008 (Ex. 49A to Pl.'s 56(a)2 Stmt.); 2) a statement in his own affidavit that he requested payment of benefits due under the excess benefit SERP (Weber Aff. ¶ 51); and 3) the affidavit of Charles Leslie, former President of FMSU, in which he identifies "an additional retirement benefit for highly paid executives" that was approved in 1994 and which was paid to him upon his retirement in 1997 (Leslie Aff., Ex. 2 to Pl.'s 56(a)2 Stmt. ¶¶ 10–11).  However, the 1994 SERP retirement benefit to which Mr. Leslie refers in his affidavit was amended by the FMSU board of directors in 2006 to provide a single

lump–sum distribution of the participants' grandfathered account upon retirement.  (Dec. 9, 2006 Unanimous Written Consent of the Board of Directors, Ex. A to Kawaguchi Dec., Ex. 2 to FMSU's 56(a)1 Stmt.)  Mr. Weber received this lump–sum payment on February 16, 2007.  (Ex. U to Murphy Dec.)  The undisputed facts demonstrate that Mr. Weber received the payment to which he was entitled under the FMSU SERP retirement benefit, and nothing in the record could allow a reasonable jury to infer that another "excess benefit SERP" existed.  FMSU is therefore entitled to summary judgment on Mr. Weber's excess benefit SERP claims; Counts Eight, Nine, Ten, and Twelve are dismissed.

>G.      Connecticut Payment of Wages Law

Mr. Weber claims in Count Eleven of his Third Amended Complaint that FMSU violated the Connecticut payment of wages law by failing to pay him all or part of his 2009 annual bonus.  (3d Am. Compl. ¶ 118.)  FMSU argues that it is entitled to summary judgment in its favor on this count because the FMSU bonus policy provides that bonuses paid to eligible employees are discretionary and are paid only if the employee is employed on the date the bonuses are paid out, and that this discretionary bonus does not constitute "wages" under the Connecticut Payment of Wages Law.  Weber argues in opposition that FMSU relies on the MBO Policy, which did not apply to Weber as a senior executive, and that senior executives were entitled to a pro rata share of their annual bonus upon termination.  Weber also argues that executive bonuses can be classified as wages under Connecticut law because they are not discretionary.

The Connecticut payment of wages law defines "wages" as "compensation for labor or services rendered by an employee, whether the amount is determined on a time, task, piece, commission, or other basis of calculation."  Conn. Gen. Stat. § 31-71a(3).  "[B]onuses

that are awarded solely on a discretionary basis, and are not linked solely to the ascertainable efforts of the particular employee, are not wages under § 31-71a(3)." *Ass'n Res., Inc. v. Wall*, 298 Conn. 145, 174 (2010) (quoting *Weems v. Citigroup*, 289 Conn. 769, 782 (2008)).  In support of his argument that the executive bonuses at FMSU were not discretionary, Mr. Weber relies entirely on the deposition testimony of Teresa Oakley that she had been told by Mr. Weber that executive bonuses were different from the MBO program and were "based on ratings and individual versus company performance." (Oakley Dep., Am. Ex. 11 to Pl.'s 56(a)2 Stmt. at 78:3–79:20.) Ms. Oakley's testimony on this matter, however, consists entirely of inadmissible hearsay as she is only relating what she was told by Mr. Weber. Accordingly, Mr. Weber does not point to any admissible evidence upon which a reasonable juror could rely to conclude that his 2009 annual bonus was not discretionary and thus constituted a wage under Conn. Gen. Stat. § 31-71a(3).  FMSU's motion for summary judgment on Mr. Weber's Connecticut payment of wages law claim is therefore granted.

> H.   Tortious Interference With Contractual Relations and Business Expectancy

Defendants HLUS and FujiFilm Corporation move for summary judgment on Mr. Weber's tortious interference with contractual relations (Count Two) and tortious interference with business expectancy (Count Three) claims, asserted only against HLUS and FujiFilm Corporation, arguing that there are no facts that support claims that these Defendants acted out of malice or for any wrongful purpose and that as parent corporations of FMSU, they had an interest in FMSU's business dealings and executive leadership and any purported interference is therefore privileged.

To succeed on a claim for interference with contractual relations or business expectancy, Mr. Weber must establish: 1) the existence of a contractual or business relationship; 2) the defendants' knowledge of that relationship; 3) the defendants' intentional and tortious interference with that relationship; and 4) actual loss suffered by Mr. Weber that was caused by the defendants' conduct. *Rioux v. Barry*, 283 Conn. 338, 351 (2007) (elements for intentional interference with contractual relations); *Hi–Ho Tower, Inc. v. Com–Tronics, Inc.*, 255 Conn. 20, 27 (2000) (elements for intentional interference with business expectancy). "A defendant is guilty of tortious interference if he has engaged in improper conduct.... [T]he plaintiff [is required] to plead and prove at least some improper motive or improper means." *Biro v. Hirsch*, 62 Conn. App. 11, 21 (2001) (alterations in original) (citations omitted).

As discussed above, there is evidence in the record here that could allow a reasonable juror to conclude that HLUS and FujiFilm Corporation acted with an improper discriminatory motive in directing the termination of Mr. Weber from FMSU. Communications to and from Mr. Tada and HLUS and FujiFilm Corporation personnel refer to Mr. Weber as an American "cancer" (7/14/2009 Nakamura Memo), refer to the removal of Mr. Weber's authority (*id.*), and state that Mr. Tada had been tasked with recovering control from American staff members (7/28/09 Tada Memo). When coupled with Mr. Tada's references to "these people over here" and "enemy camp," these communications could lead a reasonable juror to infer that HLUS and FujiFilm Corporation were motivated by discriminatory animus. There is therefore sufficient evidence for a jury to conclude that HLUS and FujiFilm Corporation acted with malice or wrongful purpose.

Ordinarily, an entity that is directly or indirectly a party to a contract cannot be held liable for tortious interference with that contract, absent allegations of willful misconduct or lack of good faith. *Boulevard Assocs. v. Sovereign Hotels, Inc.*, 72 F.3d 1029, 1036 (2d Cir. 1995). Given the evidence of bad faith discriminatory intent on the part of HLUS and FujiFilm Corporation, this privilege does not protect these Defendants from liability for tortious interference with contractual relations. HLUS's and FujiFilm Corporation's motion for summary judgment on Counts Two and Three of the Third Amended Complaint are therefore denied.

I.      Civil Conspiracy

Defendants move for summary judgment in their favor on Mr. Weber's civil conspiracy claim (Count Five), asserted against all Defendants, because he does not link his civil conspiracy theory of liability to any substantive tort. Mr. Weber responds that he asserts three substantive tort claims in his Third Amended Complaint: defamation (Count Six), tortious interference with contractual relations (Count Three), and tortious interference with business expectancy (Count Four).

"[C]ivil conspiracy is not an independent cause of action. 'Rather, the action is for damages caused by acts committed pursuant to a formed conspiracy rather than by the conspiracy itself. . . . Thus, to state a cause of action, a claim of civil conspiracy must be joined with an allegation of a substantive tort.'" *Master–Halco, Inc. v. Scilla & Natarelli, LLC*, 739 F. Supp. 2d 109, 113 (D. Conn. 2010) (quoting *Macomber v. Travelers Prop. & Cas. Corp.*, 277 Conn. 617, 636 (2006)). In his civil conspiracy count, Mr. Weber refers to the specific tort claims in his Third Amended Complaint. (*See* Third Am. Compl. ¶¶ 89–92.) Defendants' counsel claimed at oral argument that even if Mr. Weber's tort claims remain

for adjudication, the civil conspiracy count must nonetheless be dismissed because according to the Connecticut Supreme Court's decision in *Macomber*, civil conspiracy may not be pled as a stand–alone claim.  *Macomber*, however, does not set out the form in which civil conspiracy must be pled, but only requires that such a claim "be joined with an allegation of a substantive tort."  277 Conn. at 636.  Mr. Weber has joined his civil conspiracy claim with his substantive tort claims, and as discussed above, these tort claims remain for adjudication.  Defendants' motion for summary judgment on Count Five is denied.

III.    Conclusion

For the reasons stated above, Defendants' motions [Doc. ## 252, 253, 254] are GRANTED in part and DENIED in part.  Counts Seven, Eight, Nine, Ten, Eleven, Twelve, Fifteen, and Sixteen of Plaintiff's Third Amended Complaint are dismissed.  All other counts remain for adjudication.

IT IS SO ORDERED.

/s/
Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut this 24th day of February, 2012.