UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| John J. Weber,<br>        *Plaintiff*,<br>    *v.*<br>FujiFilm Medical Systems U.S.A., Inc. *et al.*,<br>        *Defendants*. | Civil No. 3:10cv401 (JBA)<br><br><br>March 19, 2013 |

**RULING ON POST–TRIAL MOTIONS**

Following a jury trial held May 18 through June 5, 2012, the jury returned a verdict on June 11, 2012 finding Defendant FujiFilm Medical Systems U.S.A., Inc. ("FMSU") liable on Plaintiff John Weber's claimed breach of contract and breach of the implied covenant of good faith and fair dealing, and finding Defendants FujiFilm Holdings America Corporation ("HLUS") and FujiFilm Corporation liable on Mr. Weber's claimed tortious interference with business contract and tortious interference with business expectancy.  The jury found no liability on Mr. Weber's Title VII national origin discrimination claim, Connecticut Fair Employment Act ("CFEPA") national origin and age discrimination claims, Age Discrimination in Employment Act ("ADEA") claim, or defamation claim.  The jury awarded $150,000 in compensatory damages for non–economic injuries caused by Defendants' unlawful conduct, and $567,357 plus prejudgment interest for economic injuries caused by FMSU's breach of contract.

Plaintiff and Defendants have filed a variety of post–trial motions regarding the validity of these findings.  Defendants HLUS and FujiFilm Corporation move for judgment as a matter of law on Plaintiff's tortious interference claims [Doc. # 484] and

for remittitur on the award of non–economic damages [Doc. # 485], and all Defendants move for a new trial [Doc. # 486].  Plaintiff moves for assessment of lost wages due for tortious interference with business expectancy [Doc. # 488], for assessment of prejudgment interest [Doc. ## 478, 479], and for a new trial on his discrimination claims [Doc. # 489].  For the reasons that follow, Defendants' Motion [Doc. # 486] for a New Trial is denied; Defendants' Motion [Doc. # 484] for Judgment as a Matter of Law is denied; Defendants' Motion [Doc. # 485] for Remittitur is denied; Plaintiff's Motion [Doc. # 489] for a new trial is denied; Plaintiff's Motion [Doc. # 488] for Assessment of Lost Wages is granted; and Plaintiff's Motion [Doc. ## 478, 479] for Assessment of Prejudgment Interest is granted in part.

## I.  HLUS and FujiFilm Corporation's Motion for Judgment as a Matter of Law [Doc. # 484]

HLUS and FujiFilm Corporation move pursuant to Fed. R. Civ. P. 50(b) for judgment as a matter of law on Plaintiff's tortious interference with contract and tortious interference with business expectancy claims.  They argue that Mr. Weber based his tortious interference claims solely on the theory that the improper motive or means required to establish such claims was the alleged discriminatory intent that underlay his national origin and age discrimination claims.  Because the jury found against Mr. Weber on the discrimination claims, Defendants claim the jury's finding on the tortious interference claims was unsupported by the evidence and could only have resulted from surmise and conjecture, and therefore those claims fail as a matter of law.

Judgment as a matter of law may be rendered if "a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. Proc. 50(a)(1). A renewed Rule 50(b) motion will be granted "only if the evidence, drawing all inferences in favor of the non–moving party and giving deference to all credibility determinations of the jury, is insufficient to permit a reasonable juror to find in his favor." *Lavin–McEleney v. Marist College*, 239 F.3d 467, 479 (2d Cir. 2001). Thus, "judgment as a matter of law should not be granted unless (1) there is such a complete absence of evidence supporting the verdict that the jury findings could only have been the result of sheer surmise and conjecture, or (2) there is such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded [persons] could not arrive at a verdict against [it]." *Id.* at 480 (quoting *DiSanto v. McGraw–Hill, Inc.*, 220 F.3d 61, 64 (2d Cir. 2000)). A movant under Rule 50 "faces a high bar." *Id.*

As a preliminary matter, Plaintiff contends that Defendants' argument may not properly be considered by the Court on a motion for judgment as a matter of law pursuant to Rule 50(b), because the pending motion states a different ground for relief than Defendants' pre–deliberation motion for judgment as a matter of law pursuant to Rule 50(a). Because a Rule 50(b) motion is merely a renewal of the movant's Rule 50(a) motion, it is "limited only to the grounds specifically raised in the prior motion for judgment as a matter of law; new grounds may not be added post–trial." *AIG Global Securities Lending Corp. v. Banc of America Securities, LLC*, 386 F. App'x 5, 6 (2d Cir. 2010) (citing *Tolbert v. Queens Coll.*, 242 F.3d 58, 70 (2d Cir. 2001)). However, the

Second Circuit has recognized a limited exception to this rule: "The forfeited issue may be reached if 'to ignore it would result in manifest injustice' or if it is a 'purely legal error.'" *Id.* (quoting *Fabri v. United Techs. Int'l, Inc.*, 387 F.3d 109, 119 (2d Cir. 2004)).

Defendants assert that they did properly raise the grounds for their pending Rule 50(b) motion in their pre–deliberation Rule 50(a) motion.  Specifically, with respect to the tortious interference claims, Defendants argued that: "there's got to be some evidence on the part of HLUS and FUJIFILM to sustain a finding of malice, improper means, and improper motives, as with—you know, and evil intent or improper intent as noted in the Court's proposed charge.  The only thing that plaintiff points to on this regard, your Honor, is the alleged discriminatory animus of age and/or national origin."  (Trial Tr. ("Tr.") at 2097).   Defendants then went on to claim that because this was the only proffered evidence of malice, the CFEPA preempted Plaintiff's tortious interference claims, an argument which they have since dropped in light of the jury's finding rejecting Plaintiff's discrimination claims.    In connection with Plaintiff's discrimination claims, Defendants argued:  "On Title VII, CFEPA and ADEA, obviously the evidence is as I think came in at the summary judgment motion that your Honor ruled was sufficient.  I do not believe it is sufficient." (*Id.* at 2100.)

Thus, while Defendants do not raise precisely the same arguments in their pending motion, they did argue in their Rule 50(a) motion that there was insufficient evidence to support a finding of malice on the tortious interference claims.  To the extent that Defendants' motion claims that an inconsistency in the jury's verdict—finding no

4

statutory discriminatory animus but tortious malice—necessitates judgment as a matter of law, this argument obviously could not have been raised before the verdict was returned, *see White v. Francis Mcdermott*, Civil No. 3:08cv634 (JBA), 2010 WL 4687620, at *1 (D. Conn. Nov. 4, 2010) (permitting defendant to raise an argument based on an inconsistency in the jury verdict for the first time in a Rule 50(b) motion), and thus the Court will consider it to prevent manifest injustice.  However, even when this argument is considered, as discussed below, the Court concludes that there was not such a complete absence of evidence showing that Defendants HLUS and FujiFilm Corporation tortiously interfered with Plaintiff's employment contract and business expectancy that the verdict should be set aside.

The elements of tortious interference with contract and/or business expectancy claims are: 1) the existence of a contract or a business relationship; 2) defendants' knowledge of that relationship; 3) defendants' intentional and tortious interference with that relationship; and 4) actual loss suffered by the plaintiff.  *Rioux v. Barry*, 283 Conn. 338, 351 (2007) (elements for intentional interference with contractual relations); *Hi–Ho Tower, Inc. v. Com–Tronics, Inc.*, 255 Conn. 20, 27 (2000) (elements for intentional interference with business expectancy).  To succeed on a tortious interference claim, Mr. Weber had to "prove at least some improper motive or improper means," *Biro v. Hirsch*, 62 Conn. App. 11, 21 (2001), used by HLUS and Fuji Film Corporation, resulting in the end of his employment relationship with FMSU.  The jury was instructed that to prevail on his tortious interference claims, Mr. Weber had to prove that HLUS and FujiFilm

Corporation "wrongfully interfered" with his contract or business expectancy with FMSU, meaning that these Defendants committed "fraud, misrepresentation, intimidation or malicious conduct." (Jury Ins. [Doc. # 469] at 26–27.)  The Court further explained that malicious conduct "is the intentional doing of a wrongful act without just cause or excuse with an intent to inflict injury or implied evil intent." (*Id.*)

Under Connecticut law "a parent company does not engage in tortious conduct when it directs its wholly–owned subsidiary to breach a contract that is no longer in the subsidiary's economic interest to perform," *Boulevard Assocs. v. Sovereign Hotels, Inc.*, 72 F.3d 1029, 1036 (2d Cir. 1995).  However, *Boulevard* articulates an exception:  "We do not hold that a [parent company] is privileged to employ *any* means, no matter how improper, to induce a breach of contract involving its [subsidiary]. . . . [C]ertain behavior may be sufficiently egregious to cross the line and become tortious."  *Id.* at 1037 (emphasis in original).  Defendants argue that Plaintiff did not present evidence of any improper means or motive that would be sufficient to override the qualified privilege that HLUS and FujiFilm Corporation enjoyed to direct FMSU to breach Plaintiff's employment contract, other than his claim of discriminatory animus, which the jury did not find proved, as shown by their verdicts on the ADEA, Title VII and CFEPA claims.[1]

---

[1] Defendants provide no legal authority for their claim that the jury was limited to weighing the theory of "improper means or motive" advanced by Plaintiff on summary judgment—i.e., discriminatory animus.  The Court's summary judgment ruling [Doc. # 322] did not hold that discriminatory animus was the only theory on which Plaintiff could recover for tortious interference, and the jury was instructed broadly as to the tortious interference claims, without any objection by Defendants.  Therefore, the Court will consider evidence supporting alternative theories of "improper means or motive" in

Plaintiff points to evidence from which the jury could conclude that HLUS and FujiFilm Corporation had improperly targeted Plaintiff for termination, and attempted to manufacture "cause" to fire him in order to avoid FMSU's payment obligation under Plaintiff's contract for termination without cause. Such conduct could be sufficiently egregious to constitute tortious interference. The jury also heard evidence that Defendant FujiFilm Corporation was anxious to terminate Plaintiff as soon as possible and was actively directing FMSU to investigate potential cause for his termination. For example, Mr. Tada, the president of FMSU, testified that he had received permission from the president of FujiFilm Corporation, Mr. Komori, to apply pressure on Plaintiff to secure Plaintiff's resignation. (*See* Tr. at 1520–21.) Mr. Tada also testified that Mr. Komori told him in a memo that the process for terminating Mr. Weber's employment was going too slowly, and that the company, in essence, should check whether misconduct or rules violations had occurred. (*See id.* at 1462–63; Tada Dep. Tr. 199–200; Pl.'s Ex. 35.) Based on these comments, the jury was entitled to infer that FujiFilm Corporation was directing the head of FMSU to look for cause to fire Plaintiff, and that even if no such cause existed,

---

ruling on the sufficiency of the evidence. *Cf. Sawant v. Ramsey*, No. 3:07-cv-980 (VLB), 2012 WL 3265020, at *4–5, (D. Conn. Aug. 9, 2012) (declining to grant judgment as a matter of law based on a theory advanced at summary judgment where the evidence presented at trial was more expansive than the summary judgment record and where the jury was instructed on alternative theories of liability); *Butz v. Bliss*, No. 84 Civ. 7030 (JMW), 1987 WL 14634, at *26 (S.D.N.Y. 1987) ("These claims were neither raised in the pleadings nor at trial. But the facts upon which they are based underlie claimants' fraud claims and since defendants had an adequate opportunity to respond to these new legal theories in post–trial briefs, the Court will address them.").

7

to terminate Plaintiff as soon as possible, designating that termination as "for cause" in order to reduce Defendants' financial obligations under the contract.

The jury also heard testimony from Mr. File, the General Counsel of HLUS, that he selected only FMSU out of all the other subsidiaries he oversaw as the target for an audit by KPMG.  (*See* Tr. at 1843–85.)  Mr. Tada and Mr. File both testified that the president of HLUS, Mr. Sakai, approved the plan for this KPMG audit and issued a formal request to have that audit take place.  (*See id.* at 1086–87, 1471.)  During trial, Mr. File testified that he and Mr. Sakai ordered the audit of FMSU to verify that FMSU would be compliant with a new Japanese regulatory law—JSOX.  (*See id.* at 1083–85.)  However, Mr. File later admitted during cross examination that whether or not a subsidiary would be subject to JSOX depended on that subsidiary's profits and sales, but he chose to audit FMSU, rather than several larger FujiFilm subsidiaries, which would have been more likely to be subject to JSOX.  (*See id.* 1163–64.)  Thus, the jury could have inferred that there was some other motive for HLUS's decision to single out FMSU for an audit.  The KPMG audit report that was issued reflected poorly on Mr. Weber's management skills. (*See id.*at 1843–85.)  Gehr Brown, a tax consultant for FMSU testified that he was "quite surprised and astounded" by the manner in which the report was issued, which based on his experience, did not comport with "common professional courtesy."  (*See id.* at 675.) Based on the outcome of the audit and the testimony about the irregular manner in which the report was issued, the jury could have inferred that the KPMG audit was actually an attempt by executives at HLUS to manufacture "cause" to fire Mr. Weber.

8

Mr. File also testified that he investigated Mr. Weber's involvement in the improper filing of articles of merger with the Secretary of State of North Carolina (the "Empiric Merger").  (*See id.* at 1105–25; Defs.' Exs. 539A–E.)  Mr. File stated that Mr. Weber's erroneous filing of the Empiric Merger documents was "a huge deal," that "caused a huge uproar" at the company.  (*See* Tr. at 1122–23.)  However, Mr. File admitted on cross–examination that for a nominal filing fee, the improperly filed articles of merger could have been taken off the North Carolina Secretary of State's website immediately.  (*See id.* at 1135–36.)  Thus, there was evidence based on which the jury could have questioned the claimed severity of this filing error.  Furthermore, the jury heard testimony that only Mr. Weber was disciplined for this incident, despite the involvement of at least one other employee, Rick Rohan, who had been asked to perform a legal review of the documents before they were signed.  (*See id.* at 1195–97, 1204.)  The jury could infer based on Defendants' decision to discipline only Mr. Weber, a non–attorney, rather than the legal counsel involved in the incident, for the misfiling of legal documents, that Mr. File's stridency regarding the erroneous filing was part of an attempt to create "cause" to terminate Mr. Weber's employment.  Such an inference would have been further supported by the fact that Mr. Weber had had a long tenure as an executive with FMSU.

This evidence is sufficient to give rise to a reasonable inference that FujiFilm Corporation first targeted Plaintiff for termination and then directed the officers of HLUS and FMUS to come up with "cause" for his termination such that Defendants could avoid

their financial obligations to Plaintiff under his employment contract. The jury could reasonably infer from Mr. Komori's impatience regarding Plaintiff's termination that Mr. Komori hoped to find some ostensible reason to fire Mr. Weber for cause quickly and that he had directed his employees to investigate Mr. Weber to identify such a reason. The jury could infer that Mr. File's strident focus on Mr. Weber's conduct for investigation and disciplinary action was in aid of the plan to identify a purported justification to terminate Plaintiff "for cause." Contrary to Defendants' arguments, such a conclusion would be consistent with the jury's other findings: the jury found that FMSU breached its implied covenant of good faith and fair dealing in its treatment of Plaintiff (*see* Jury Verdict [Doc. # 468] at 3), and the evidence of Mr. File's and Mr. Sakai's investigation of Plaintiff's conduct, and of Mr. Komori's involving himself in the decision to terminate and process for terminating Plaintiff is at least minimally sufficient to support an inference that HLSU and FujiFilm Corporations directed and participated in FMSU's bad faith conduct.

This is not to suggest that it would be improper for a parent company to direct its subsidiary to fire an employee for economic or performance–related reasons, or to investigate allegations of employee misconduct and perform other "garden–variety personnel actions." *Malik v. Carrier Corp.*, 202 F.3d 97, 110 (2d Cir. 2000) (finding no tortious interference where defendant pursued a review of sexual harassment allegations against plaintiff over the objection of his supervisor). Thus, under similar circumstances, a parent company could properly have directed its subsidiary to fire an employee without

cause and without severance.  However, a parent company's actions become wrongful when it directs its subsidiary to falsely designate an employee's termination with the damaging label "for cause" just to avoid the financial obligations to pay severance for a without–cause termination.  Falsely terminating an employee for cause has the potential to damage that individual's reputation and psyche and to limit his or her future employment opportunities and earning potential, thus causing him serious injury.  The evidence at trial was sufficient to permit a jury to infer that Defendants FujiFilm Corporation and HLUS encouraged FMSU to make such an unjustified designation when terminating Plaintiff, forming the basis of their verdicts on tortious interference. Therefore, Defendants' Motion for Judgment as a Matter of Law on Plaintiff's tortious interference claims is denied.

## II.   Defendants' Motion for a New Trial [Doc. # 486]

All Defendants move pursuant to Federal Rule of Civil Procedure 59 for a new trial on the grounds that the Court improperly prevented Defendants from introducing certain evidence, the jury instructions were erroneous, and Plaintiff's counsel improperly and prejudicially referred to a Japanese "sneak attack" in subtle reference to Pearl Harbor Day in her closing argument.

Rule 59(a) reads in part: "The court may, on motion, grant a new trial on all or some of the issues—and to any party— . . . after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A).  "A new trial must be granted if the court determines that the verdict is

11

against the weight of the evidence, that the damages are excessive, or that, for other reasons, the trial was not fair to the party moving." *Santa Maria v. Metro–North Commuter R.R.*, 81 F.3d 265, 273 (2d Cir. 1996).

### A.   Evidentiary Rulings[2]

#### 1.   New York Supreme Court's Summary Judgment Order

After Mr. Weber filed this case, FMSU sued him in New York Supreme Court, Westchester County Commercial Division, alleging that he breached his fiduciary duty to FMSU, committed fraudulent misrepresentation and fraudulent concealment, constructive fraud, conversion, and violated New York's Business Corporation Law § 720 by authorizing salary and benefits payments to a former employee, Louise Collins, after she stopped working at FMSU due to a non–work related back injury, providing salary advances to other FMSU employees on an interest–free basis, and maintaining an improper business agreement with Auric Capital Corporation and its President, Kenneth Ostrowsky.   On May 25, 2012, during the course of the jury trial in this case, the New York court granted summary judgment in Mr. Weber's favor on all of FMSU's claims against him, finding that "it was well known within FMSU that Collins was receiving salary and health benefits even though she was no longer actively working with FMSU

---

[2] Throughout their briefing, the parties incorrectly refer to certain evidence as "after–acquired evidence."   While the New York Supreme Court's summary judgment order precluded the parties from claiming that this evidence was actually "after" acquired, in the interest of consistency, the Court will use the parties' terminology in considering their arguments.

and, further, Weber acted on what he perceived were the instructions from the Presidents of FMSU," *FMSU v. Weber*, No. 50385/11, slip. op. at 39–40 (N.Y. Sup. Ct. May 25, 2012).

At this trial, Defendants sought to introduce evidence of the Collins's payments, the Auric/Ostrowsky relationship, and the interest–free salary advances as after–acquired evidence that would have permitted FMSU to fire Mr. Weber for cause had it been known prior to his termination, thus limiting Plaintiff's potential damages and theories of recovery.   After–acquired evidence, however, is by definition evidence of alleged misconduct that Defendants did not discover until after terminating Mr. Weber's employment and therefore could not have relied on in deciding to fire him.   *See McKennon v. Nashville Banner Publ. Co.*, 513 U.S. 352, 359–60 (1995).  Evidence that was known at the time of termination could not be deemed "after" acquired and thus would not be relevant to limit Plaintiff's recovery.   In light of the New York Supreme Court's holding that this evidence was known to Defendants while Plaintiff was employed and thus could not be "after" acquired, this Court determined that the New York decision had preclusive effect, and excluded the evidence of Mr. Weber's alleged misconduct for that purpose.  (*See* Tr. at 1285–86, 1427–32.)

Under New York law,[3] collateral estoppel precludes a party "from raising an issue (1) identical to an issue already decided (2) in a previous proceeding in which that party had a 'full and fair opportunity' to litigate."  *Fuchsberg & Fuchsberg v. Galizia*, 300 F.3d

---

[3] "[A] state court judgment must be given the same preclusive effect as it would have under the law of the state in which it is rendered."  *Kulak v. City of New York*, 88 F.3d 63, 71 (2d Cir. 1996).

105, 109 (2d Cir. 2002). "This doctrine applies only if the issue in the second action is identical to an issue which was raised, necessarily decided and material in the first action, and the plaintiff had a full and fair opportunity to litigate the issue in the earlier action." *City of New York v. Welsbach Elec. Corp.*, 9 N.Y.3d 124, 128 (2007) (internal quotation marks and citations omitted). Defendants argue that this Court erred in applying the doctrine of collateral estoppel to preclude evidence of the Collins payments, the interest free loans, and the Auric/Ostrowsky relationship because the New York Supreme Court did not decide the issue of whether Mr. Weber's conduct would have constituted "cause" under his employment agreement. In so arguing, however, Defendants misinterpret this Court's ruling and misstate the issue that was necessarily decided in the New York action and thus precluded from this case.

The issue to which the Court gave preclusive effect was the New York Supreme Court's determination that the evidence of Mr. Weber's alleged conduct was not "after" acquired. The New York Supreme Court found in its summary judgment ruling that Mr. Weber had shown in that action that FMSU and its leadership were aware of the Collins payments, the interest free loans, and the Auric/Ostrowsky relationship at the time Mr. Weber authorized or participated in these actions. *FMSU v. Weber*, slip. op. at 39–43. Because the New York court's decision precluded FMSU from arguing to the contrary— that it did not know of Mr. Weber's actions with respect to the Collins payments, interest free loans, and the Auric/Ostrowsky relationship at the time it terminated his employment—evidence of these actions would merely have been evidence of alleged

14

misconduct by Weber of which Defendants were aware at the time of his firing but upon which they did not rely in deciding to fire him.  Thus, the evidence of Plaintiff's earlier conduct is irrelevant as to whether or not the "for cause" termination asserted by Defendants was legitimate or pretext because, while it was known, it was not used to justify that termination.  Thus the evidence, which was not admissible as "after–acquired" evidence, was not relevant as evidence of "cause" for Plaintiff's termination because Defendants did not rely on it in deciding to fire Mr. Weber, and was properly barred.

2.      *After–Acquired Evidence Mitigating Compensatory Damages*

Defendants argue that the Court also improperly precluded them from introducing this evidence on the issue of compensatory damages.  In *McKennon*, 513 U.S. at 359–61, the Supreme Court held that evidence of employee misconduct discovered by an employer after that employee has been discharged, i.e. "after–acquired evidence," does not excuse the employer from Title VII liability because "[t]he employer could not have been motivated by knowledge it did not have and it cannot now claim that the employee was fired for the nondiscriminatory reason."  After–acquired evidence of employee wrongdoing may, however, be admissible to limit the available equitable remedy to back pay up to the date the after–acquired evidence was discovered as long as the employer can "establish that the wrongdoing was of such severity that the employee in fact would have been terminated on those grounds alone if the employer had known of it at the time of the discharge." *Id.* at 362–63.  According to Defendants, although the Supreme Court did not address compensatory damages in *McKennon*, it follows that *McKennon*'s temporal

15

limitation on back pay damages is equally applicable to compensatory damages.  Because of the difference in the nature of compensatory damages and back pay, this Court disagrees.

As they did at trial, Defendants rely primarily on *Russell v. Microdyne Corp.*, 65 F.3d 1229 (4th Cir. 1995) and *Cross v. Samper*, 501 F. Supp. 2d 59 (D.D.C. 2007).   In *Russell*, the Fourth Circuit held that after–acquired evidence of Ms. Russell's falsification of information on her job application did not restrict her ability to recover compensatory damages under Title VII for her employer's discriminatory actions occurring prior to the date her employer discovered application falsification:

> "[B]ecause Russell's complaint contains examples of unlawful activity in 1992, she would be eligible for damages, both compensatory and punitive, resulting from actions occurring between November 21, 1991 [the effective date of the Civil Rights Act of 1991], and May 25, 1993 [the date Microdyne discovered the after–acquired evidence], regardless of whether the doctrine of after–acquired evidence applies."

65 F.3d at 1241.  In so holding, the Fourth Circuit concluded that the plaintiff could recover compensatory damages only for discriminatory conduct that occurred before her employer discovered the after–acquired evidence of her malfeasance, but did not put any limit on the duration of compensable injury for which recovery could be sought.  In other words, as long as the injury was caused by an employer's action taken before the after–acquired evidence was discovered, the plaintiff could recover compensatory damage resulting from that action.

In *Cross*, the court permitted the defendant to introduce after–acquired evidence to the jury to argue that compensatory damages would be cut off as of the date the after–

16

acquired evidence was discovered.  501 F. Supp. 2d at 65.  *Cross*, however, misapplied *Russell*, which it characterized as standing for the proposition that "any recovery by Ms. Russell would be limited to the period between the alleged discrimination and the date on which the new information was discovered, whether that recovery be in terms of back pay for discriminatory failure to promote or compensatory or punitive damages."  *Id.* at 64 (citing *Russell*, 65 F.3d at 1241).  The *Cross* court reasoned that there was no basis to treat compensatory damages differently from equitable back pay remedies because "[i]f proven wrongdoing by Mr. Cross did not limit the period for which he could be considered for compensatory damages, he would receive an inequitable windfall."  *Id.* at 65.  However, the only limitation on compensatory damages imposed in *Russell* was for compensatory damages for actions taken by her employer after the date the employer discovered the after–acquired evidence.  *Russell* set no limit on the plaintiff's recovery for compensatory damages caused by employer conduct prior to that date.

The essence of other courts' conclusions to the contrary is that there is a difference between compensatory damages and equitable remedies such that they should be treated differently.  In *Miller v. Beneficial Management Corp.*, 855 F. Supp. 691, 716–17 (D.N.J. 1994), the court found that the plaintiff employee's misconduct—misrepresenting her qualifications on her application—revealed after her termination, did not "diminish the psychological or emotional injury caused to the employee by the employer's violation" of the plaintiff's "right to be free from racial or ethnic indignity" under the New Jersey Law Against Discrimination.  "There appears to be no principled basis, therefore,

for the application of the after–acquired evidence defense in this case to bar compensatory relief for emotional suffering." *Id.* at 717.  The Northern District of Illinois similarly found in *Johnson v. G.D.F., Inc.*, No. 07 C 3996, 2008 WL 4225836, *2 (N.D. Ill. Sept. 12, 2008), that "[t]he rationale of *McKennon*, that a plaintiff should not recover wages after the date his employer would have legitimately terminated him . . . simply does not apply" to compensatory damages for noneconomic injuries such as pain and suffering.  "Because, unlike lost wages, compensatory damages could continue to accrue even after an employee's misconduct is discovered, the Court holds that *McKennon* does not impose a temporal limit on those damages." *Id.*

Defendants attempt to distinguish *Miller* and *Johnson* by arguing that those cases dealt only with claims that compensatory damages were barred in whole by after–acquired evidence, whereas here the relevant issue is whether the after–acquired evidence at issue should have been permitted to be introduced as grounds for "cutting off" compensatory damages as of a certain date.  Defendants misconstrue these cases.  *Johnson* specifically addressed the issue of whether *McKennon* applied to limit compensatory damages beyond the date on which an employer "would have legitimately terminated" an employee and concluded that it did not.  2008 WL 4225836 at *2.  If after–acquired evidence does not mitigate compensatory damage because Plaintiff's emotional suffering resulting from Defendants' misconduct continues, without regard to a later determination that Plaintiff likely could have been fired for other reasons than those given, then this evidence has no relevance.  *See also Miller*, 855 F. Supp. at 716–17.

The Court is in agreement with the conclusions in *Miller* and *Johnson*, which reflect the sound view that after–acquired evidence is irrelevant to the calculation of non–economic compensatory damages, and Defendants' motion for a new trial on the ground that the Court improperly excluded after–acquired evidence for this purpose is therefore denied.

3.    *After–Acquired Evidence and Breach of Contract*

Defendants also argue that the Court improperly excluded after–acquired evidence on Mr. Weber's breach of contract claim on the issue of whether he breached his employment contract first, which FMSU sought to offer in support of its affirmative defense to breach of contract liability.

Under certain circumstances, after–acquired evidence of an employee's previously unknown misconduct may be admissible to demonstrate that the employee materially breached his or her contract prior to the employer's breach, and therefore cannot seek to enforce the terms of the contract against the breaching employer.  *See Naylor v. Rotech Healthcare, Inc.*, 1:08–CV–95, 2009 WL 5206005, *1 (D. Vt. Dec. 23, 2009) ("In wrongful termination claims alleging breach of express or implied contract, liability depends on the parties' actions, not their intent. As a result, after–acquired evidence may show the employee breached the contract first, and can provide a complete defense to liability."); *Dobinsky v. Crompton & Knowles Colors, Inc.*, 3:02CV1291, 2004 WL 2303686, at *6 (M.D. Pa. March 30, 2004) ("[I]f the plaintiffs materially breached the contract first, i.e. performed in such a way as to provide cause for their termination, they will not be able to

enforce the terms of the contract. If, on the other hand, the plaintiffs did not materially breach the contract first, then the defendants will be liable for the damages provided for in the employment agreement. The only facet we are adding to the Pennsylvania law is our holding that after-acquired information can be used by the defendants to justify the plaintiffs' terminations. And as explained, this holding is in accord with the majority of jurisdictions.").   As discussed above, however, the evidence that Defendants sought to admit on the Auric/Ostrowsky relationship and Mr. Weber's role in the Collins payments, was not after–acquired.  *See FMSU v. Weber*, slip. op. at 39–43.   Because FMSU, through its upper management, was aware of Mr. Weber's conduct in these matters before Plaintiff was fired for different reasons, Defendants were precluded from arguing that these actions could constitute prior breach by Mr. Weber of his employment contract, relieving them of liability, since as determined by the New York Supreme Court's summary judgment record they knew of Plaintiff's activities took no action to discipline or fire him, thus acquiescing.  (*See* supra Part II.A.1.)

### B.    Jury Instructions

Defendants argue that the Court's jury instructions were fundamentally erroneous in that (1) they misstated the findings of the New York state summary judgment order in *FMSU v. Weber*; (2) the instruction that Mr. Weber prevailed in the New York case was unfairly prejudicial and improper; (3) the instructions improperly prohibited the jury from considering whether FMSU would have terminated Mr. Weber when they discovered the after–acquired evidence of his misconduct; and (4) the instructions should

have permitted the jury to consider Mr. Weber's known and unknown misconduct with respect to the breach of contract claim.

1.      *New York Case Findings*

In connection with Mr. Weber's breach of contract claim, the Court instructed the jury that "Mr. Weber's actions regarding the interest free loans and the Auric/Ostrowsky relationship were known to FMSU and are therefore not after–acquired evidence which could support Defendants' claim that Mr. Weber breached his contract first." (Jury Ins. at 24.) As discussed above, the New York Supreme Court found from the summary judgment record that FMSU was aware of the Collins payments, the interest free loans, and the Auric/Ostrowsky relationship prior to Mr. Weber's termination. *FMSU v. Weber*, slip. op. at 39–43. Specifically, the New York court found that the Collins payments were "well known within FMSU," *id.* at 39, that the evidence demonstrated that the interest–free salary advances were "an authorized practice by FMSU's Presidents and the executive committee," *id.* at 40, and that the Auric/Ostrowsky relationship had been approved by FMSU's executive committee, *id.* at 42. Because these findings are entitled to preclusive effect in this case, establishing for the purposes of Mr. Weber's breach of contract claim, that the interest–free loans and Auric/Ostrowsky relationship were already known to FMSU by the time Plaintiff was fired, the jury was properly instructed in this regard.

2.      *Weber's Success in New York*

During trial, on May 22, 2012, Defendants' counsel referenced FMSU's case against Mr. Weber in New York state court. (*See* Tr. at 638–639.) During the final jury

instructions, the Court informed the jury: "You heard Defendants' attorney reference in a question a lawsuit brought by FMSU against John Weber in New York state court. This case has been decided in Mr. Weber's favor and you are not to consider the existence and dismissal of that lawsuit as any evidence in this case." (Jury Ins. at 10.) Because the jury had already been informed by Defendants' counsel that FMSU had sued Mr. Weber in a separate proceeding, it was appropriate to instruct the jury that that other action had been resolved in Mr. Weber's favor, but was outside the jurors' purview. Defendants' discontent with respect to this instruction hardly merits a new trial.

### 3.  After–Acquired Evidence

The Court instructed the jury that it could not consider the after–acquired evidence of Mr. Weber's alleged misconduct "as evidence of whether Defendants would have fired Mr. Weber if and when they learned of this evidence." (Jury Ins. at 22.) Defendants argue that this instruction was improper because this after–acquired evidence was relevant to the determination of compensatory damages. However, as discussed above, the Court has rejected this argument. (*See* supra Part II.A.2.)

### 4.  Known and Unknown Misconduct

With respect to FMSU's defense to Mr. Weber's breach of contract claim that Mr. Weber himself breached his contract and therefore could not enforce the terms of the contract against FMSU, the Court instructed the jury:

> FMSU asserts as a defense to Mr. Weber's breach of contract claim that Mr. Weber himself materially breached his employment agreement prior to his termination, unbeknownst to FMSU. If a party to a contract materially breaches that contract, that party is barred from enforcing the

terms of the contract.  Here, Defendants argue that Mr. Weber materially breached his contract by performing in such a way so as to provide cause for his termination, i.e. he committed "willful malfeasance which would tend to have a material adverse effect on the interests of the company," when he approved the letter to Louise Collins' landlord, took no corrective action knowing of Larry Hart's actions with respect to the profit sharing plan, and/or directed profit sharing accruals.  If Defendant FMSU proves by a preponderance of the evidence that, unbeknownst to FMSU at the time, Mr. Weber breached his contract prior to being fired, then Mr. Weber cannot enforce his contract against FMSU and cannot recover any damages for breach of contract.

In order to succeed on this defense, FMSU must show that Mr. Weber materially breached his contract through any of these actions, and that FMSU did not become aware until after it terminated Mr. Weber's employment.  You may consider any conduct of Mr. Weber's of which FMSU was aware prior to his termination in evaluating whether FMSU's "cause" assessment was legitimate and accurate if FMSU relied on that conduct in deciding to fire Mr. Weber, but you may not consider conduct of which FMSU was aware in evaluating this defense.  Therefore, the evidence that you may consider in evaluating this defense is only the after–acquired evidence that FMSU asserts concerns Mr. Weber's alleged misconduct.  You may not consider this after–acquired evidence in determining Defendants' motivations in firing Mr. Weber or whether they fired Mr. Weber "for cause"; you may only consider it for the purpose of deciding whether Mr. Weber breached his employment contract before FMSU terminated him.

(Jury Ins. at 22–23.)

Again, after–acquired evidence of alleged misconduct by Mr. Weber could be relevant to the defense that Mr. Weber breached his contract first.  *See Naylor*, 2009 WL 5206005 at *1; *Dobinsky*, 2004 WL 2303686 at *6.  However, any misconduct of which FMSU was aware prior to terminating Weber, yet did not rely on in deciding to terminate him, could not constitute prior breach by Plaintiff.  If FMSU knew of a material contract breach by Mr. Weber, but chose not to terminate him for that breach and continued to accept the benefits of its contract with him, it waived its right to terminate his

employment contract for cause based on that conduct.  *Ed Kimber Heating & Cooling, Inc. v. Travelers Cas. & Sur. Co.*, 411 F. Supp. 2d 111, 117 (D. Conn. 2006) ("If a party has knowledge of the other party's breach and continues to accept the benefits of the contract, that acceptance constitutes waiver of the right to terminate based on the prior breaches.") Because FMSU effectively waived its claim of Plaintiff's contract breach by its acquiescence to his actions, it was not error to instruct the jury that it could not consider evidence of alleged misconduct by Mr. Weber of which FMSU was aware before he was terminated in evaluating Defendants' proof of this  defense.

### C.    "Sneak Attack" Reference

Defendants lastly argue that they are entitled to a new trial because of the prejudicial effect of Plaintiff's counsel's description of their conduct as a "sneak attack" during her closing argument.  Defendants had moved *in limine* to exclude from trial any reference to Pearl Harbor Day, and the Court ruled [Doc. # 411] that "Plaintiff will not be allowed to refer to Pearl Harbor Day or identify December 7, 2009 as Pearl Harbor Day." After Ms. Cortese Costa's clearly improper use of the phrase "sneak attack" during her closing, Defendants' counsel requested that the Court "admonish[]" her in front of the jury, inform the jury that she violated the Court's order, and instruct them not to be influenced by the comment (Tr. at 2185–86), which the Court did:  "any argument by counsel which directly or indirectly alludes to the Pearl Harbor attack is improper and contrary to the Court's prior orders to all counsel.  It should be disregarded and given no effect" (*id.* at 2187).

Although appeals to bias and prejudice may unfairly influence a jury's verdict and warrant a new trial, where a trial court immediately gives a curative instruction, such an extreme remedy is not required.  *Compare Pappas v. Middle Earth Condo. Ass'n*, 963 F.2d

534, 540–41 (new trial warranted where defendant's counsel appealed to regional bias in his closing, the trial court overruled plaintiff's objection, and no curative instruction was given), *with Greenbaum v. Handelsbanken*, 67 F. Supp. 2d 228, 274 (S.D.N.Y. 1999) (new trial unwarranted where there was "only one potentially race–based remark in the context of an eleven–day trial, which contained extensive witness testimony and opening and summation remarks and ended with a jury verdict that displayed a level of thoroughness that belies any suggestion of passion–based judgment").  Since the prejudice to Defendants of the "sneak attack" remark was that it could inflame potential anti–Japanese bias for the Pearl Harbor surprise attacks, the curative instruction directly addressed it. In light of this instruction, the length of the trial, and the limited nature of the comment, the Court is satisfied that Ms. Cortese Costa's deplorable use of the term "sneak attack" during her closing argument does not warrant a new trial.

### III.    HLUS and FujiFilm Corporation's Motion for Remittitur [Doc. # 485]

"If a district court finds that a verdict is excessive, it may order a new trial, a new trial limited to damages, or, under the practice of remittitur, may condition a denial of a motion for a new trial on the plaintiff's accepting damages in a reduced amount." *Tingley Systems, Inc. v. Norse Systems, Inc.*, 49 F.3d 93, 96 (2d Cir. 1995).  A judgment cannot be upheld where the damages awarded are "so excessive that it shocks the judicial conscience." *Phillips v. Bowen*, 278 F.3d 103, 11 (2002).  In assessing whether an award is excessive, it is appropriate to review "awards in other cases involving similar injuries, bearing in mind that any given judgment depends on a unique set of facts and circumstances." *Scala v. Moore McCormack Lines, Inc.*, 985, F.2d 680, 684 (2d Cir. 1993).

HLUS and FujiFilm Corporation move for remittitur on the jury's award of non–economic damages, arguing that the $150,000 award should be reduced because Mr. Weber's emotional distress was relatively minor, and other cases with similar circumstances have reduced compensatory damages awards to far below what the jury awarded here.   Because Plaintiff was awarded compensatory damages on his state common law tortious interference claims, Defendants' motion is governed by Connecticut's substantive law.   *See Gagne v. Town of Enfield*, 734 F.2d 904, 905 (2d Cir. 1984); *McInnis v. Town of Weston*, 458 F. Supp. 2d 7, 16 (D. Conn. 2006).    Under Connecticut law:

> The size of the verdict alone does not determine whether it is excessive. The only practical test to apply is whether the award falls somewhere within the necessarily uncertain limits of just damages or whether the size of the verdict so shocks the sense of justice as to compel the conclusion that the jury was influenced by partiality, prejudice, mistake or corruption.

*Bracey v. Bd. of Educ. of City of Bridgeport*, 368 F.3d 108, 117–18 (2d Cir. 2004) (quoting *Gaudio v. Griffin Health Servs., Corp.*, 249 Conn. 523, 551 (1999)).   "The Court views the evidence concerning damages in the light most favorable to the plaintiff, determining whether the verdict returned was reasonably supported thereby."   *Id.* (internal citations and quotation marks omitted).

During trial, Plaintiff testified that his termination for cause came as a "total shock," which stayed with him "for quite some time."   (Tr. at 178.)   He felt "isolated" and "cut off from the company that [he] helped build."   (*Id.*)   Mr. Weber also reported that he had trouble sleeping, lost approximately twenty–five pounds, and "kind of lost interest in

everything." (*Id.* at 178–79.) Plaintiff also testified that several of his colleagues and customers contacted him regarding his departure from FMSU and asked whether he had been terminated for cause (*see id.* 193–94, 199–200), which he found "devastating because [his] whole career was based on integrity" (*id.* at 200). Plaintiff sought treatment from his family physician, Dr. Kelly, who diagnosed him with "depression secondary to job loss" and prescribed Lexapro for depression and Ambien as a sleep aid. (*Id.* at 179, 417.) Dr. Kelly did not refer Mr. Weber for follow–up treatment, and Mr. Weber stopped taking his prescribed medication after several days. (*See id.* at 430, 1913–14.) Plaintiff's expert, Dr. Levin, testified that he diagnosed Plaintiff as suffering from major depressive disorder, based on Plaintiff's "drop in self–esteem," "decrease in his pleasure and interest in activities," "low energy," and "diminished concentration" (*id.* at 2013), and categorized Plaintiff's condition as "severe" (*see id.* at 2021). Dr. Levin also stated that while Plaintiff was in "relatively good spirits" at the beginning of their interview, when he began to discuss his job loss "he was clearly sad and distraught." (*Id.* at 2018.)

Defendants contend that the evidence of Plaintiff's emotional distress amounts to no more than a "garden variety" claim, for which courts in this state have typically limited verdicts to the $50,000 range. *See Craine v. Trinity College*, No. CV 950555013S, 1999 WL 1315017, at *15 (Conn. Super. Ct. Dec. 27, 1999) ("In 'garden variety,' discrimination cases in which the plaintiff suffers depression, sadness, and loss of pride, the maximum amount for pain and suffering appears to be roughly $50,000." (internal citations and quotation marks omitted)). Defendants argue that the evidence of Mr. Weber's

emotional distress is similar to the evidence presented in *Schnazer v. United Technologies Corp.*, 120 F. Supp. 2d 200 (D. Conn. 2000), in which this Court remitted a jury award of $175,000 in compensatory damages to $40,000 and $45,000 respectively for the two plaintiffs. In *Schnazer*, the Court found that the evidence showed "neither extreme trauma nor permanent injury." *Id.* at 218. The plaintiffs in *Schnazer* did not seek medical help for their emotional distress, suffered no physical symptoms, and failed to support their own, subjective testimony with evidence from medical experts. *See id.* at 218–19. The Court found that while the plaintiffs suffered shock and humiliation,

> there was no evidence of workplace mistreatment or humiliation. They were laid off, not terminated for individual performance deficiencies. No somatic manifestations of distress or behavioral changes were described, and there was no evidence of serious or traumatic consequences or impact on the plaintiffs' family or personal relationships.

*Id.* at 219. Both the circumstances of Plaintiff's termination and its emotional impact are markedly distinguishable from *Schnazer*. Unlike the plaintiffs in *Schnazer*, who were laid off as a part of a reduction in force, Plaintiff was summarily terminated for cause, which the jury later determined to be unfounded, and he credibly testified that he was shocked by the loss of his long–term employment and deeply humiliated by the rumors surrounding his termination. (*See* Tr. at 200.) Furthermore, Plaintiff suffered physical manifestations of his emotional distress, including difficulty sleeping and weight loss. (*See id.* at 178–79.) Unlike the plaintiffs in *Schnazer*, Plaintiff sought medical treatment for his symptoms (*see id.* at 179, 417), and the medical testimony that the jury heard was

28

far from the suffering of "garden variety" depression, but rather was a clinical diagnosis of severe major depressive disorder (*see id.* at 2013, 2021).

Plaintiff's evidence of emotional distress was similar to that presented in *McInnis v. Town of Weston*, 458 F. Supp. 2d 7 (D. Conn. 2006), in which this jury also rejected the plaintiff's age discrimination claims, and in which this Court remitted a jury verdict for emotional damages to $150,000.  In *McInnis*, as here, although the evidence "included no proof of permanency of injury nor any pre–existing condition disposing plaintiff to exceptional severity of emotional injury," the plaintiff had testified  that his "emotional distress was sufficiently serious for him to seek counseling,[4] and produced somatic manifestations, including observable sleep impairment and social withdrawal."  *Id.* at 18. Mr. Weber's situational depression, while not permanent, caused him acute suffering, some of which he feels at present.  (*See* Tr. at 187–88.)  Of particular note, although the jury in *McInnis* rejected the plaintiff's age discrimination claims, the Court found evidence was consistent with the plaintiff having been deprived of his "professional identity and job satisfaction" by the defendant's actions in subjecting him to a series of unfounded investigations and disciplinary procedures.  *See id.*  Here, while Plaintiff's age discrimination claims were also rejected, there was sufficient evidence for the jury to find that Plaintiff had similarly suffered a loss of professional identity based on Plaintiff's

---

[4] Mr. Weber sought treatment for his symptoms, did not attend additional counseling sessions, and shortly stopped taking the medication he was prescribed.  (*See* Tr. at 430, 1913–14.) This testimony was not dissimilar to the evidence in *McInnis*, where the plaintiff's treating physician did not recommend that he see a psychiatrist to obtain medication.  *See McInnis*, 458 F. Supp. 2d at 18 n.6.

testimony about the shock and hurt of being terminated from the company to which he had dedicated decades of his life.

Thus, while an award of $150,000 is not insubstantial for the circumstances of this case, it was amply supported by the evidence at trial, is not out of line with other approved verdicts in Connecticut based on similar circumstances, and certainly does not "shock the conscience" of the Court.  *See, e.g.*, *Tomick v. United Parcel Service, Inc.*, 135 Conn. App. 589, 616–17 (2012) (upholding a verdict of $300,000 where plaintiff testified to a sense of loss of self–worth, had difficulty sleeping, and lost weight after his termination); *Howell v. New Haven Bd. of Educ.*, No. 3:02CV736 (JBA), 2005 WL 217952, at *8–10 (D. Conn. Sept. 8, 2005) (declining to remit a verdict of $200,000 based on the "emotional timbre of plaintiff's testimony" and "the deep trauma and pain of his experience"); *Ragin v. Laidlaw Transit, Inc.*, 3:97CV0024 (GLG), 1999 WL 977603, at *4–5 (D. Conn. Oct. 4, 1999) (remitting a verdict from $250,000 to $150,000 where plaintiff had no evidence of medical treatment or physical symptoms, and did not suffer direct humiliation with co–workers as a result of failure to receive a promotion); *Gaudio v. Griffin Health Servs. Corp.*, 249 Conn. 523, 529 (1999) (upholding a verdict of $100,000 where plaintiff testified that a romantic relationship ended as a result of his depression, he was "emotionally devastated" by his discharge, he suffered low self–esteem, and he lost a substantial amount of weight).  Defendants' Motion for Remittitur is without merit and is therefore denied.

**IV.     Plaintiff's Motion for Assessment of Lost Wages [Doc. # 488]** [5]

Following the jury's verdict, Plaintiff's counsel requested that the Court assess lost wages, including back pay and front pay, resulting from Defendant HLUS and FujiFilm Corporation's tortious interference with business expectancy, and submitted a memorandum [Doc. # 466] in support of the request.  Mr. Weber now moves pursuant to Fed. R. Civ. P. 59(e) to amend the Court's judgment to include an award of lost wages for Defendants' tortious interference.   While Plaintiff argues that lost wages are the appropriate measure of damages in an action for tortious interference in the employment context, as Defendants note in their briefing, Plaintiff cites no Connecticut case law that expressly holds that a plaintiff may recover front pay and back pay in an action for tortious interference with contract or business expectancy.  Defendants thus contend that an award of lost wages is not available in this action.[6]

Under Connecticut law, "the appropriate measure of damages in an action for tortious interference with a business expectancy is . . . the pecuniary loss to the plaintiff of

---

[5] Plaintiff also moves [Doc. # 480] for clarification as to whether the Court will consider Defendants' arguments as to the legal sufficiency of Plaintiff's tortious interference claims, which Defendants raised in their reply briefing to Plaintiff's motion for assessment of lost wages.  Because the parties had the opportunity to fully brief and respond to these arguments in connection with Defendants' motion [Doc. # 484] for judgment as a matter of law, Plaintiff's motion for clarification is DENIED as moot.

[6] Defendants also argue that because the jury awarded zero economic damages in relation to Plaintiff's tortious interference claims, the jury has affirmatively concluded that Plaintiff suffered no economic damages.  However, the Court instructed the jury, with the consent of the parties, not to consider lost wages when determining Plaintiff's economic damages on those claims because the Court would determine the amount of lost wages in a separate proceeding.  (*See* Jury Ins. at 29.)  The Court presumes "that the jury followed the court's instructions," *United States v. Joyner*, 201 F.3d 61, 69 (2d Cir. 2000),  and therefore the jury's finding of zero economic damages has no bearing on the issue of whether Plaintiff is entitled to lost wages in relation to his tortious interference claims.

the benefits of the business relation." *American Diamond Exchange v. Alpert*, 101 Conn. App. 83, 103 (2007); *see also* Restatement (Second), Torts, § 774A ("One who is liable to another for interference with a contract or prospective contractual relation is liable for damages for . . . the pecuniary loss of the benefits of the contract or the prospective relation."). In the employment context, the pecuniary loss of the benefit of the employment relationship can be measured by lost wages. *See Chandler v. Bombardier Capital*, 44 F.3d 80, 83–84 (2d Cir. 1994) (upholding an award of back pay for a tortious interference claim brought under Vermont law);[7] *see also* 44B Am. Jur. 2d Interference § 61 ("The damages . . . that an employee whose employment is terminable at will is entitled [to], if discharged because of interference by another, are those damages that can be reasonably established, taking into account the type and stability of the employment; the past employment record; the employee's age, health, ability to labor; and the probability that the employment would otherwise have continued. The sum that an employee would have earned had such employment continued is prima facie the measure of damages. Where it appears that a discharged employee has lost considerable time without being able to secure work and that this condition will continue for some time in the future, the damages may include loss of employment, not only up to the time of the action, but also future unemployment."). *Cf. Herman v. Endriss*, 187 Conn. 374 (1982) (finding that plaintiff's claim for damages for tortious interference was not mooted by her employer's death, where plaintiff claimed damages for lost wages and benefits). Thus, conceptually, an award of front pay and back pay may be appropriate in a tortious

---

[7] Under Vermont law "[i]n an action for interference with the business relations of another, the plaintiff may recover such damages sustained by him as are a natural and proximate consequence of the interference. This includes such loss as the plaintiff can prove to have resulted directly and proximately from the defendant's wrongful acts." *Giroux v. Lussier*, 127 Vt. 520 (1969).

interference case in the employment context and Plaintiff's motion for assessment of lost wages is granted.  The Court will determine the amount, if any, of economic damages to which Plaintiff is entitled on his tortious interference claims in a separate proceeding to be scheduled.

**V.      Plaintiff's Motion for Assessment of Prejudgment Interest [Docs. ## 478, 479]**

Plaintiff moves pursuant to Fed. R. Civ. P. 59(e) and Conn. Gen. Stat. § 37-3a, for an assessment of ten percent compound prejudgment interest on the economic damages awarded for his breach of contract claim.  (*See* Jury Verdict at 6 ("What amount of damages do you find will reasonably compensate Mr. Weber for the economic injuries proximately caused by FMSU's breach of contract?   $565,357 plus prejudgment [interest].").)  Defendant argues that an award of compounding interest is not proper under Connecticut law, and that prejudgment interest at a rate of one percent is more appropriate in this case.

State law applies to the calculation of prejudgment interest on state law claims. *See Marfia v. T.C. Ziraat Bankasi*, 147 F.3d 83, 90 (2d Cir. 1998).   Under Conn. Gen. Stat. § 37-3a, Plaintiff may recover "interest at the rate of ten per cent a year, and no more." "[T]he primary purpose of § 37-3a [] is not to punish persons who have detained money owed to others in bad faith but, rather, to compensate parties that have been deprived of the use of their money."  *Sosin v. Sosin*, 300 Conn. 205, 230 (2011).  The Connecticut Supreme Court has held that an award of interest under this statute is discretionary, *id.* at 229, and that ten percent is "the maximum rate of interest that a trial court, in its discretion, can award," *Gianetti v. Meszoros*, 268 Conn. 424 (2004).  "Simply to choose 10.0% as the interest rate because that is the only number referenced in § 37-3a is not the proper exercise of judicial discretion."  *Owens, Shine & Nicola, P.C. v. Travelers Cas. &*

33

*Sur. Co. of America*, No. CV095024601S, 2011 WL 3200296, at *13 (Conn. Super. Ct. June 24, 2011).

Defendants argue that the Court should look to the rate for one–year United States Treasury Bills during the recent past, which has remained below one percent, to determine what rate would be sufficient to compensate Plaintiff.  (*See* Defs.' Opp'n [Doc. # 481].)  While Defendants do not cite any case in which a court awarded prejudgment interest based on the prevailing rate on Treasury Bills, the Court "may consider all relevant information [including] evidence relative to the rate of interest available during the [relevant] period" in determining the rate of interest to award.  *Sears Roebuck and Co. v. Bd. of Tax Review of the Town of West Hartford*, 241 Conn 749, 766 (1997).   In support of his claim for ten percent compounded interest, Plaintiff has submitted evidence that the total return on the S&P 500 for the period from January 1, 2010 to June 30, 2012 was 10.6%.  (*See* Ex. B to Pl.'s Reply [Doc. # 482].)  Plaintiff further argues that because the jury found that Defendants acted in bad faith, an award of compounded interest is appropriate.  *See Harris v. Harris*, No. FA920513790, 2007 WL 3038234, at *1–2 (Conn. Super Ct. Oct. 2, 2007).  *But see Northeast Connecticut Economic Alliance, Inc. v. ATC Partnership*, 2005 WL 3292122 (Conn. Super. Ct. Nov. 9, 2005) (noting that § 37-3a "is generally understood to contemplate simple interest").  However, in light of Defendants' evidence of the low interest rate climate in the recent past, the Court finds that awarding ten percent compounded interest would provide an unwarranted windfall to Plaintiff.  *See Daimlerchrysler Ins. Co., LLC v. Pambianchi*, No. 3:08cv943 (MRK), 2011 WL 721630, at *2 (D. Conn. Feb. 23, 2011) ("Awarding prejudgment interest at a 10% annually compounded rate during a recession would result in a significant windfall.").

Courts in Connecticut have recently found that awarding simple interest at a rate of four to six percent appropriately compensates a plaintiff for deprivation of the use of his or her money.   In *Bernhard—Thomas Bldg. Sys., LLC v. Weitz Co., LLC*, 3:04-cv-1317 (CFD), 2011 WL 5222682, at *3 (D. Conn. Oct. 31, 2011), Judge Droney surveyed recent case law from the District of Connecticut and Connecticut state courts and found that an interest rate of four percent was appropriate.  *See also Hartford Steam Boiler Group, Inc. v. SVB Underwriting, Ltd.*, 3:04CV2127 (SRU), 2011 WL 1899392, at *11 (D. Conn. May 19, 2011) (awarding prejudgment interest at a rate of four percent); *Kasper v. Valluzzo*, No. FSTCV075004383S, 2011 WL 8883574, at *16 (Conn. Super. Ct. Dec. 23, 2011) (awarding prejudgment interest at a rate of six percent); *DiLustro v. Pascarella*, No. CV106015451S, 2011 WL 4424756, at *4 (Conn. Super. Ct. Sept. 7, 2011) (awarding prejudgment interest at a rate of five percent).  Furthermore, as Defendant points out, Plaintiff's own report of the total return on the S&P 500 over the relevant time period equates to 4.24 percent annual simple interest.  (*See* Def.'s Sur–reply [Doc. # 483-1] at 2.)  In consideration of the economic context for time–frame of Plaintiff's discharge, the Court concludes that Plaintiff should be awarded prejudgment interest at a simple annual rate of four percent from January 1, 2010, the date of Plaintiff's termination, to June 15, 2012, the date of the entry of judgment in this case, for a total award of $32,899.13 in prejudgment interest.

**VI.    Plaintiff's Motion for a New Trial on Discrimination Claims [Doc. # 489]**

Plaintiff moves pursuant to Fed. R. Civ. P. 59 for a new trial on his national origin and age discrimination claims, arguing that (1) the evidence at trial established that Mr. Weber's national origin and age were motivating factors in his termination, and there was no adequate basis for the jury finding of no liability on his discrimination claims; (2) the Court's admission of after–acquired evidence of alleged misconduct by Mr. Weber was

35

incorrect and prejudicial; and (3) the Court's jury instructions improperly suggested to the jury that Defendants had established that Mr. Weber committed misconduct while employed at FMSU.

### A.    Evidence of Discrimination

Mr. Weber argues that the jury's verdict on his discrimination claims was "clearly and substantially erroneous" because there was direct evidence that the decision to terminate him was based on age and national origin and Defendant's evidence did not counter this direct evidence of discriminatory intent.   Mr. Weber claims as direct evidence of discrimination a November 2007 internal Fuji audit prepared by Masahiro Miki that suggested re–evaluation of the "old" management at FMSU (Trial Ex. 31), the "two–year plan" to terminate Mr. Weber, who was referred to by Hiroaki Tada, President of FMSU, as the "top American" (Trial Ex. 33), and Mr. Tada's plan to hand over management to the "younger generation" (Trial Ex. 40).   At trial, however, Mr. Miki testified that his word choice in the November 2007 audit report did not have "anything to do with age." (Tr. at 1004–05.)  Mr. Tada testified that Mr. Weber was fired because of poor management, the KPMG audit, and the improper Empiric filing (Tr. at 1502), and that he referred to Mr. Weber as the "top American" for no "particular reason other than . . . the American was Mr. Weber, equal to Mr. Weber" (*id.* at 1340).

"A court considering a Rule 59 motion for a new trial must bear in mind, however, that the court should only grant such a motion when the jury's verdict is egregious." *DLC Management Corp. v. Town of Hyde Park*, 163 F.2d 124, 134 (2d Cir. 1998) (internal quotation marks and citations omitted).   "Accordingly, a court should rarely disturb a jury's evaluation of a witness's credibility." *Id.*   All of the supposedly "direct" evidence of discrimination relied on here by Plaintiff was explained and/or

rebutted by witnesses at trial, whose testimony, as reasonably relied on by the jury, established that Mr. Weber's national origin and/or age were not motivating factors in the decision to terminate his employment.  The Court will not disturb the jury's evaluation of this evidence, and Mr. Weber is not entitled to a new trial on this ground.

> **B.     After–Acquired Evidence of Alleged Misconduct**

Mr. Weber argues that the admission of after–acquired evidence of his alleged misconduct at FMSU was erroneous and highly prejudicial, and that this error warrants a new trial on his discrimination claim.  He claims that the Court's decision to admit after–acquired evidence on the discrimination claims violated the "law of the case" insofar as the Court previously dismissed FMSU's counterclaims that related to this after–acquired evidence of misconduct.  Mr. Weber, however, fails to point to any particular piece of after–acquired evidence that prejudiced his discrimination claims, and he ignores the fact that the Court explicitly instructed the jury that it was not permitted to consider any after–acquired evidence in deciding those claims.  The Court instructed the jury:

> You heard evidence during trial of alleged actions by Mr. Weber, which Defendants claim they were not aware of at the time they made the decision to terminate Mr. Weber's employment, also known as "after–acquired evidence."  As I have previously instructed you, if Defendants were not aware of this evidence at the time they fired Mr. Weber, they could not have been motivated by it in reaching their decision to fire Mr. Weber and you may not consider it as having any bearing on Defendants' intent or motivations in making that termination decision.  You may not consider it as evidence relevant to Mr. Weber's discrimination claims, nor may you consider it as evidence of whether Defendants would have fired Mr. Weber if and when they learned of this evidence.

(Jury Ins. at 22.)

In light of this instruction, and Plaintiff's failure to point to what evidence he believes the Court improperly admitted, Mr. Weber is not entitled to a new trial on this ground.

### C.    Jury Instructions and Mr. Weber's Alleged Misconduct

Mr. Weber lastly argues that he is entitled to a new trial because the Court's jury instructions improperly suggested to the jury that Defendants had established that he committed certain misconduct while employed at FMSU.  He specifically objects to the following instruction:

> Defendants argue that Mr. Weber materially breached his contract by performing in such a way so as to provide cause for his termination, i.e. he committed "willful malfeasance which would tend to have a material adverse effect on the interests of the company," when he approved the letter to Louise Collins' landlord, took no corrective action knowing of Larry Hart's actions with respect to the profit sharing plan, and/or directed profit sharing accruals.  If Defendant FMSU proves by a preponderance of the evidence that, unbeknownst to FMSU at the time, Mr. Weber breached his contract prior to being fired, then Mr. Weber cannot enforce his contract against FMSU and cannot recover any damages for breach of contract.
>
> In order to succeed on this defense, FMSU must show that Mr. Weber materially breached his contract through any of these actions, and that FMSU did not become aware until after it terminated Mr. Weber's employment.

(Jury Ins. at 23.)  Plaintiff argues that this instruction suggested that Defendants had actually proven that he approved the Collins letter and acted improperly with respect to the profit sharing plan and accruals.

Contrary to Plaintiff's objection, the instruction above makes clear that these examples of alleged misconduct are what "Defendants argue" Mr. Weber did in breach of his contract, not what Defendants had proven Mr. Weber did.  Further, even if the jury

had been confused by this instruction, the Court further instructed the jury, as discussed above, that it "may not consider" after–acquired evidence of alleged misconduct "as evidence relevant to Mr. Weber's discrimination claims." (*Id.* at 22.)   Given this instruction, and the presumption "that the jury followed the court's instructions," *United States v. Joyner*, 201 F.3d 61, 69 (2d Cir. 2000), Mr. Weber is not entitled to a new trial on this ground.

**VII. Conclusion**

For the reasons discussed above, Defendants' Motion [Doc. # 486] for a New Trial is DENIED; Defendants' Motion [Doc. # 484] for Judgment as a Matter of Law is DENIED; Defendants' Motion [Doc. # 485] for Remittitur is DENIED; Plaintiff's Motion [Doc. # 489] for a new trial is DENIED; Plaintiff's Motion [Doc. # 488] for Assessment of Lost Wages is GRANTED; Plaintiff's Motion [Doc. # 480] for Clarification is DENIED as moot; and Plaintiff's Motion [Doc. ## 478, 479] for Assessment of Prejudgment Interest is GRANTED in part.   The Court will issue an order setting the schedule for the parties' briefing on the amount of lost wages to be assessed in relation to Plaintiff's tortious interference damages forthwith.

IT IS SO ORDERED.

_____/s/_____

Janet Bond Arterton, U.S.D.J.


Dated at New Haven, Connecticut this 19th day of March, 2013.